Argued and submitted July 11, 2008, reversed and remanded for new trial with instructions to provide peremptory instruction to jury on the existence of a physician-patient relationship October 28, 2009

Cynthia Lynn MEAD,
*Plaintiff-Appellant,*

*v.*

LEGACY HEALTH SYSTEM,
an Oregon corporation;
Legacy Good Samaritan Hospital and Medical Center,
an Oregon corporation;
and Hubert Leonard, M.D.,
*Defendants,*

*and*

David ADLER, M.D.,
*Defendant-Respondent.*

Multnomah County Circuit Court
040201947; A130969

220 P3d 118

Maureen Leonard argued the cause for appellant. With her on the briefs were Deborah L. Martin and Luvera, Barnett, Brindley, Beninger & Cunningham.

Michael T. Stone argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

In this medical malpractice case, plaintiff appeals a judgment for defendant, Dr. Adler, an on-call neurosurgeon who gave advice over the telephone to an emergency room physician or resident physician concerning plaintiff's care. The case turns on whether the circumstances of that communication gave rise to a physician-patient relationship between defendant and plaintiff. The trial court denied plaintiff's motion for a directed verdict on the issue of the existence of a physician-patient relationship and submitted the question to the jury, with instructions as to what constitutes such a relationship. On appeal, plaintiff assigns error to, among other rulings, the denial of her motion for a directed verdict, to the court's instruction to the jury, and to the court's failure to give her own requested instruction. She also assigns error to the trial court's evidentiary ruling with respect to Mary Carter agreements[1] that plaintiff entered into with defendants Legacy Health System, Legacy Good Samaritan Hospital, and Dr. Leonard, all of whom have been dismissed from the case.[2] Because we conclude that defendant's conduct gave rise to a physician-patient relationship as a matter of law, we conclude that the trial court erred in submitting the question of the existence of a physician-patient relationship to the jury and reverse the judgment for defendant and remand.

The relevant evidence is as follows: On July 1, 2002, defendant was the neurosurgeon on call for Legacy Good Samaritan Hospital. Defendant's responsibility to be on call was a condition of his having privileges to treat patients at Legacy Good Samaritan Hospital. As the on-call neurosurgeon, defendant had an obligation to be available for

---

[1] A "Mary Carter agreement" is an agreement between a plaintiff and some, but fewer than all, defendants, under which settling parties limit financial responsibility of settling defendants, usually in inverse ratio to any recovery that the plaintiff is able to make against the nonsettling defendants. *Booth v. Mary Carter Paint Company*, 202 So 2d 8 (Fl Dist Ct App 1967). *See generally Grillo v. Burke's Paint Co.*, 275 Or 421, 425 n 1, 551 P2d 449 (1976) (describing development of Mary Carter terminology).

[2] Throughout this opinion, we refer to Adler as "defendant," and to the Legacy defendants and Leonard as the "settling defendants."

patients who presented neurosurgical concerns on an emergency basis.

Plaintiff came to the emergency room on the morning of July 1, 2002, unable to walk due to severe low back pain and weakness in her legs. Dr. Aviva Zigman, the emergency room physician, examined plaintiff. A second-year resident was also present in the emergency room and examined plaintiff. Based on her findings, Zigman suspected that plaintiff either had a herniated disk or was developing cauda equina syndrome, a serious neurological condition caused by compression of the nerves at the base of the spinal cord that requires immediate surgery. Zigman ordered an MRI, and that MRI showed a herniated disc at L3-4. That result caused Zigman to worry more about the possibility of cauda equina syndrome, and she testified that for that reason she decided to contact defendant, who was the neurosurgeon on call that day. Zigman and defendant relate different versions of the telephone conversation.

Zigman testified that she personally spoke to defendant and concisely presented plaintiff's case, describing plaintiff's symptoms and the MRI report, including specifically mentioning the herniated disc. Zigman testified that defendant told her that plaintiff could go home with pain medication and bed rest. Zigman testified that she was surprised by that advice and told defendant that plaintiff could not be sent home because she could not walk. Zigman testified that defendant then told her to admit plaintiff for one day for observation and pain management, under her primary physician's name. Zigman noted her consultation with defendant in the hospital chart and called plaintiff's primary physician, Dr. Kisor, to ask that plaintiff be admitted for observation and pain management.

Defendant presented a different version of the conversation. He testified that he did not speak to Zigman. He did, however, agree that he spoke about plaintiff's condition to a male physician in the emergency room who may have been a resident. Defendant testified that the resident told him that he had a patient "with bad back pain, who was neurologically intact, who had an MRI with a disc bulge, and who

had normal rectal tone." He testified that it was his perception that the conversation with the resident was "a sort of a phone call for advice," to determine whether the patient needed to be seen by a neurosurgeon. He testified that, based on the information provided to him by the resident at that time, he believed that plaintiff's primary concern was pain and that he did not believe that plaintiff's condition demonstrated the existence of a neurosurgical issue.

Defendant testified that, after a brief conversation, he told the resident physician that plaintiff should be admitted by her primary physician for observation and pain management; he acknowledged that the implication of his advice was that plaintiff did not need neurosurgery at that time.[3] Defendant testified that he did not expect that the resident physician would rely on his advice, and that he did not consider that plaintiff would be admitted to his service. Defendant testified that he was not asked on July 1 to examine plaintiff, that he never told the physician that he would examine plaintiff or become involved in plaintiff's treatment, and that he never assumed responsibility for and did not expect to play a role in her care. He did not bill the hospital for his telephone conversation on July 1. Defendant stated that he anticipated that, if plaintiff's condition deteriorated neurologically, he would be called.

Kisor, plaintiff's primary physician, visited plaintiff in the hospital that evening and requested a neurosurgical and psychiatric consult. Kisor testified that, in her conversation with Zigman, Zigman told her that defendant did not think that plaintiff required surgery. Kisor and Zigman both

---

[3] When asked by plaintiff's counsel whether he had indicated to the resident physician that, in his opinion, plaintiff was not a surgical candidate at that time, defendant testified, "That was the implication behind my responding to the question for advice about what to do with [plaintiff], that she should be admitted to the medical services and that she did not need neurosurgery at that time." Notably, in his statement of the facts on appeal, defendant recites *Zigman's* version of the telephone conversation, rather than his own, and omits mention of his own testimony that he advised the resident physician that plaintiff did not require surgery and that she should be admitted for observation and pain management. Although we are required to view the evidence in the light most favorable to defendant, we cannot disregard a defendant's own undisputed testimony, even if it is unfavorable to him.

believed that defendant would come to the hospital to evaluate plaintiff after her admission. Kisor also consulted with Leonard, a neurologist[4] who had treated plaintiff over the years for headaches. Plaintiff's condition deteriorated; she continued to lose strength and sensation in her legs. Both Kisor and Leonard testified that they sought a consult from defendant but that he did not return their calls. Defendant testified that a nurse made a consult request on Kisor's behalf on either July 3 or 4, but that defendant simply told the nurse to have Kisor call him.

On July 5, defendant examined plaintiff and looked at her MRI results and determined that she had "a very large herniated disk with cauda equina syndrome." He performed emergency surgery to relieve compression of the nerves. Plaintiff suffers from permanent impairment. At the time of trial, she was unable to walk without assistance and was incontinent of bowel and bladder. She required 24-hour assistance and could not care for her three children alone.

Plaintiff filed this medical malpractice claim. The case went to trial. Defendant asserted that he had no liability to plaintiff because the two had not entered into a physician-patient relationship at the time of the alleged negligent conduct. At the close of the evidence, plaintiff sought a partial directed verdict that she and defendant had a physician-patient relationship.[5] The trial court denied the motion and submitted the question of the existence of the relationship to

---

[4] A neurologist is "[a] specialist in the diagnosis and treatment of disorders of the neuromuscular system." *Stedman's Medical Dictionary* 1210 (27th ed 2000). A neurosurgeon is "[a] surgeon specializing in operations on the brain, spinal cord, spinal column, and peripheral nerves." *Id.* at 1214.

[5] The Supreme Court has said that the proper motion to be made when seeking a determination that the movant is entitled to prevail on less than all the elements of a claim is a motion to withdraw an issue from the jury by way of a peremptory instruction rather than a motion for a directed verdict. *Hagan v. Gemstate Manufacturing, Inc.*, 328 Or 535, 543-44, 982 P2d 1108 (1999); *see Erickson Air-Crane Co. v. United Tech. Corp.*, 87 Or App 577, 579, 743 P2d 747, *rev den*, 304 Or 680 (1987). The effect of either motion is the same, and, on appeal, the standard for reviewing the trial court's ruling on a request for a peremptory instruction would be the same as our review of the directed verdict ruling; the question is whether, based on the evidence viewed in the light most favorable to defendant, plaintiff was entitled to a determination as a matter of law that there was a physician-patient relationship. *See Hoekstre v. Golden B. Products*, 77 Or App 104, 109, 712 P2d 149 (1985), *rev den*, 300 Or 563 (1986).

the jury. In a special verdict, the jury found that there was no physician-patient relationship in existence on July 1. On appeal, plaintiff assigns error to the trial court's denial of her motion for directed verdict, contending that defendant's communication on July 1, which plaintiff asserts constituted diagnosis and treatment, gave rise to a physician-patient relationship as a matter of law.

In reviewing the trial court's denial of plaintiff's motion, we consider the evidence, including any inferences, in the light most favorable to defendant as the party who obtained the favorable verdict; the verdict cannot be set aside "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary" to support it. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

Plaintiff's claim is for medical malpractice. In *Zehr v. Haugen*, 318 Or 647, 653-54, 871 P2d 1006 (1994), the Supreme Court described the elements of a claim for medical malpractice: (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) a causal link between the breach and the harm. Generally, a claim for medical malpractice will lie only for negligence committed in the context of a physician-patient relationship. *Sullenger v. Setco Northwest, Inc.*, 74 Or App 345, 348, 702 P2d 1139 (1985). Thus, at the outset, plaintiff is required to establish that she and defendant had a physician-patient relationship.

Although no Oregon case deals specifically with facts analogous to those here, our case law offers guidance in determining whether a special relationship exists. As we said in *Shin v. Sunriver Preparatory School, Inc.*, 199 Or App 352, 366, 111 P3d 762 (2005), the issue is fact dependent. *See also Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 334, 39 P3d 903, *rev den*, 334 Or 190 (2002) (explaining that the cases undertake a "functional as opposed to a formal analysis" in determining whether a special relationship exists, based not on the name of the relationship but on the roles that the parties assume in the particular interaction at issue). In *Conway v. Pacific University*, 324 Or 231, 240, 924 P2d 818 (1996), the Supreme Court explained that the special relationship arises

"because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution."

A special relationship arises out of the responsibility of one person to act on behalf of and in the best interests of the other. An implicit aspect of the special relationship is that it is consensual—the party to whom the duty is owed authorizes the party who owes that duty to exercise independent judgment on the former party's behalf, and the party who owes the duty voluntarily assumes that responsibility.

As with other special relationships, a physician-patient relationship is consensual; that is, both the doctor and the patient must agree to it. *See State v. Miller*, 300 Or 203, 212, 709 P2d 225 (1985) (for purpose of testimonial privilege, psychotherapist must indicate that he or she is willing to embark upon psychotherapist-patient relationship); *see also Corbet v. McKinney*, 980 SW2d 166, 169 (Mo App 1998) (physician-patient relationship is a consensual one in which the patient knowingly employs the physician and the physician knowingly consents to treat the patient). That mutual consent to a relationship can be express, as in the circumstance of an ongoing relationship or when the patient seeks out and the physician expressly agrees to treat the patient. The consent may also be implied from conduct showing an intention to embark upon such a relationship. *Miller*, 300 Or at 212 (indication of intent to embark on physician-patient relationship may be inferred from circumstances). For example, a patient's consent to the relationship can be implied from the patient allowing the physician to treat him or her.

■ In the absence of an express agreement by the physician to treat a patient, a physician's assent to a physician-patient relationship can be inferred when the physician takes affirmative action with regard to care of the patient. *See Adams v. Via Christi Regional Medical Center*, 270 Kan 824, 837, 19 P3d 132, 140 (2001). Defendant agrees that, because

the essence of the physician's responsibility is diagnosis and treatment of the patient,[6] by undertaking to diagnose or treat a patient, a physician takes affirmative action that implies consent to a physician-patient relationship. *See Sprinkle v. Lemley*, 243 Or 521, 528-29, 414 P2d 797 (1966) (upholding jury instruction stating that physicians who together diagnose and treat a patient are jointly liable); *see also Spiess v. Johnson*, 89 Or App 289, 292, 748 P2d 1020 (1988) (plaintiff who was never treated by physician had no claim against him; *Triplett v. Bd. of Social Protection*, 19 Or App 408, 414, 528 P2d 563 (1974) (for purposes of physician-patient privilege, physician-patient relationship is treatment of medical problems); *State ex rel Juv. Dept. v. Martin*, 19 Or App 28, 33, 526 P2d 647 (1974), *rev'd on other grounds*, 271 Or 603, 533 P2d 780 (1975) (for purposes of testimonial privilege, physician-patient relationship exists if physician engages in diagnosis or treatment).

This case presents the first opportunity for an Oregon appellate court to consider whether the type of interaction here—an on-call physician's advice to an emergency room physician over the telephone concerning a specific patient—gives rise to a physician-patient relationship. Many other jurisdictions have considered the issue, and some general principals have developed: Courts uniformly hold that contractual formalities are not required for the creation of a physician-patient relationship, and that a consensual relationship *can* arise without personal contact with the patient, based on a physician's contact with another physician acting on behalf of a patient. *See, e.g., Bovara v. St. Francis Hosp.*, 298 Ill App 3d 1025, 1030, 700 NE2d 143, 146 (1998); *Walters v. Rinker*, 520 NE2d 468, 472 (Ind App 1988); *Oja v. Kin*, 229 Mich App 184, 190-91, 581 NW2d 739 (1998); *St. John v. Pope*, 901 SW2d 420, 424 (Tex 1995). Generally, however, in the absence of some connection with the patient, merely listening to another physician's description of a patient's symptoms and offering a professional opinion regarding the proper

---

[6] Under ORS 677.085(4), a person practices medicine in Oregon if the person:

"Offer[s] or undertake[s] to diagnose, cure or treat in any manner, or by any means, methods, devices or instrumentalities, any disease, illness, pain, wound, fracture, infirmity, deformity, defect or abnormal physical or mental condition of any person."

course of treatment is not enough to imply a physician's consent to a physician-patient relationship with the patient; in that circumstance, the consulted physician is generally considered to be offering only informal assistance to a colleague. *See, e.g., Reynolds v. Decatur Mem. Hosp.*, 277 Ill App 3d 80, 86, 660 NE2d 235 (1996); *Oja*, 229 Mich App at 190-91;[7] *Hill v. Kokosky*, 186 Mich App 300, 303, 463 NW2d 265 (1990); *Flynn v. Bausch*, 238 Neb 61, 66, 469 NW2d 125 (1991).

Jurisdictions that have considered it, however, have held that, if the consulted physician is contacted because he or she is on call, that communication is not in the category of an "informal consult," especially if the physician's on-call obligation is contractual or a condition for hospital privileges. Even so, a relationship with the patient generally will not be implied when the on-call physician expressly declines to participate in the patient's care or makes no diagnosis when the recommended treatment is rejected by the treating physicians. *See Miller v. Martig*, 754 NE2d 41 (Ind App 2001) (physician-patient relationship did not exist between on-call doctor and obstetric patient where doctor did not make recommendations about patient's condition or treatment and did not participate in any course of treatment, but informed patient that doctor would not take patient's case because he was not qualified to do so); *Majzoub v. Appling*, 95 SW3d 432, 438 (Tex App 2002) (no physician-patient relationship arises where on-call doctor does not make a diagnosis or any medical decisions with regard to patient). Thus, the on-call status of a physician in and of itself does not establish a physician-patient relationship with every patient who comes into the emergency room. *See, e.g., Corbet*, 980 SW2d at 170 (Mo App 1998); *Fought v. Solce*, 821 SW2d 218, 220 (Tex App 1991)

---

[7] That court stated:

"[M]erely listening to another physician's description of a patient's problem and offering a professional opinion regarding the proper course of treatment is not enough. Under those circumstances, a doctor is not agreeing to enter into a contract with the patient. Instead, she is simply offering informal assistance to a colleague. At the other end of the spectrum, a doctor who is on call and who, on the phone or in person, receives a description of a patient's condition and then essentially directs the course of that patient's treatment, has consented to a physician-patient relationship."

229 Mich App at 190-91.

(physician volunteering to be on call did not have duty to treat patient who came into emergency room); *Anderson v. Houser*, 240 Ga App 613, 618, 523 SE2d 342, 347 (1999) (patient not intended third-party beneficiary of physician's contract with hospital). If, however, an emergency room physician contacts the on-call physician, who affirmatively undertakes to diagnose or treat the patient, and such direction is acted upon by the physician, a physician-patient relationship arises by implication between the on-call physician and the patient, even if the on-call physician does not personally examine the patient or seek to admit the patient within the physician's service. *See, e.g., Sterling v. Johns Hopkins Hospital*, 145 Md App 161, 187, 802 A2d 440 (Md Ct Spec App 2002) ("In the final analysis, we take it as well-settled that a physician-patient relationship may arise by implication where the doctor takes affirmative action to participate in the care and treatment of a patient."); *Oja*, 229 Mich App at 191; *Lection v. Dyll*, 65 SW3d 696 (Tex App 2001) (on-call physician's evaluation of information provided by emergency room doctor and medical decision concerning the patient's need for treatment and admission to the hospital, and emergency room physician's reliance on the on-call physician's diagnosis and treatment plan, were sufficient to create a question of fact as to whether on-call physician took affirmative acts necessary to create a physician-patient relationship).

■ In summary, the consensus of the jurisdictions that have considered the question is that a physician-patient relationship can arise by implied consent of the physician based on indirect contact between the physician and patient through telephone communication between a hospital emergency room physician and an on-call physician concerning the care of an emergency room patient; the pivotal inquiry is whether the on-call physician affirmatively participates in the care of the patient. That affirmative participation exists if the on-call physician undertakes to diagnose or treat the patient. The parties agree with that statement of the law. Guided by our own case law concerning the consensual nature of the physician-patient relationship, *see State v. Miller*, 300 Or at 212, we also conclude that an on-call physician who affirmatively undertakes to diagnose or treat an

emergency room patient over the telephone has impliedly consented to a physician-patient relationship for purposes of negligence liability.

■ Because the existence of a special relationship is a fact-specific inquiry, it is generally one for the trier of fact; if, however, the relevant facts are undisputed, the court may decide the question as a matter of law. *Abraham v. T. Henry Construction, Inc.*, 230 Or App 564, 571, 217 P3d 212 (2009). The trial court in this case allowed the question of the physician-patient relationship to be decided by the jury rather than direct a verdict as requested by plaintiff or issue a peremptory instruction. With the foregoing legal analysis in mind, we consider whether there is any evidence in support of the jury's verdict that there was no physician-patient relationship between defendant and plaintiff, or whether the trial court erred in submitting that issue to the jury because there was no evidence in the record from which the jury could find that defendant did not affirmatively undertake to diagnose or treat plaintiff. *Brown v. J. C. Penney Co.*, 297 Or at 705. Stated differently, the question before us is whether the evidence required the conclusion, as a matter of law, that defendant affirmatively undertook to diagnose or treat plaintiff. Once again, in reviewing the trial court's denial of plaintiff's motion, we consider the evidence, including any inferences, in the light most favorable to defendant. *Brown*, 297 Or at 705 (evidence reviewed in light most favorable to party who received favorable verdict).

As previously noted, both parties agree that the pivotal question in determining whether there was a physician-patient relationship is whether defendant affirmatively undertook to diagnose or treat plaintiff and thereby impliedly consented to such a relationship. In plaintiff's view, in telling the hospital physician that plaintiff did not require neurosurgical treatment and that she should be admitted for observation and pain management, defendant affirmatively undertook to diagnose and treat plaintiff. Defendant contends that his advice was nothing more than a suggestion that could be accepted or rejected. We note, however, that, in the guise of viewing the evidence in the light most favorable to defendant, defendant relies only on *Zigman's* testimony of the July 1 telephone conversation and omits mention of the

two essentially undisputed facts that plaintiff asserts constituted diagnosis and treatment: his own testimony that he told the resident to admit plaintiff for observation and pain management and that he implicitly told the resident that plaintiff was not a neurosurgical candidate.

Although we view the evidence in the light most favorable to defendant, we are not free to ignore defendant's own testimony that he advised the resident physician that plaintiff did not require surgery; that testimony was not contradicted by any evidence and was, in fact, corroborated by other evidence. Furthermore, defendant's testimony that he told the resident to have plaintiff admitted for observation and pain management was consistent with Zigman's testimony that, after she told defendant that plaintiff could not be sent home, defendant advised Zigman to have plaintiff admitted. We are not at liberty to disregard that evidence. Those facts, admitted by defendant and not otherwise contradicted, are deemed to be undisputed.

Thus, viewing the record in the light most favorable to defendant, we summarize the undisputed facts: By presenting herself to the hospital emergency room for treatment on July 1, plaintiff agreed to a physician-patient relationship with the physicians who treated her there. As a condition of having privileges at the hospital, defendant was required to be on call on a regular schedule and was the neurosurgeon on call on July 1. On July 1, a physician from the hospital called defendant, as the neurosurgeon on call, and sought advice concerning plaintiff's condition and treatment. Defendant took the call. Defendant listened to the physician's description of plaintiff's symptoms and in effect advised the physician that plaintiff (1) did not need neurosurgical treatment and (2) should be admitted by her primary physician for observation and pain management. The resident did not ask defendant to examine plaintiff on July 1, and defendant did not come to the hospital that night. Plaintiff's primary physician admitted plaintiff to the hospital for observation and pain management.

In light of those facts, we consider first whether they show as a matter of law that defendant made a diagnosis or treatment. "Diagnose" is defined in *Webster's Third New Int'l*

*Dictionary* 622 (unabridged ed 2002) as "**1** : to identify (as a disease or condition) by symptoms or distinguishing characteristics **2** : to determine the causes of or the nature of by diagnosis." "Diagnosis" is defined, in turn, as "the art of or act of identifying a disease from its signs and symptoms." *Id.* *Stedman's Medical Dictionary* 491 (27th ed 2000), defines "diagnosis" as "[t]he determination of the nature of a disease, injury, or congenital defect." As pertinent here, *Webster's* defines "treatment" as "the action or manner of treating a patient medically or surgically." *Id.* at 2435. *Stedman's* defines "treatment" as the "[m]edical or surgical management of a patient." *Id.* at 1866. We have no difficulty concluding that, in light of defendant's on-call status, in analyzing the information provided to him by the resident and providing a medical opinion—albeit in part implicit—that plaintiff's condition did not require surgery and that she should be admitted for observation and pain management, defendant made affirmative medical decisions concerning plaintiff's care that constituted diagnosis and treatment and thereby implicitly consented to a physician-patient relationship.

Contrary to defendant's contention, his advice to the hospital physician was not merely casual or informal advice to a colleague rather than a diagnosis directed to a specific patient. Defendant was called because of his on-call status, not because he was a colleague. In light of that status, which obligated defendant to be available to patients who presented a need for his specialty, his advice was not casual. Although defendant's on-call status in and of itself did not give rise to a physician-patient relationship with plaintiff, that status, combined with defendant's advice that plaintiff was not a neurosurgical candidate and should be admitted for observation and pain management, constituted diagnosis and treatment and did constitute implied consent to a physician-patient relationship with plaintiff. Defendant's on-call status and the attendant obligation to be available distinguish this case, which is limited to its facts, from the casual "curbside" consult that one physician may provide to another as a professional courtesy. We conclude that defendant's diagnosis and treatment of plaintiff gave rise to a physician-patient relationship as a matter of law and that the trial court therefore erred in submitting that question to the jury.

Plaintiff's remaining assignments of error relate to several rulings concerning Mary Carter settlement agreements that plaintiff entered into with the three settling defendants, Leonard, Legacy Health System, and Legacy Good Samaritan Hospital and Medical Center, who were subsequently dismissed from the case. Because the issues presented in those assignments of error will likely arise on remand, we address them.

■      Before trial, plaintiff entered into similar settlement agreements with the settling defendants. The agreements were admitted into evidence and provided generally that plaintiff would be guaranteed a certain recovery from the settling defendants, in exchange for plaintiff's agreement not to execute on "any judgment that may be entered" against the settling defendants in an amount in excess of the settlement amounts. The key provisions, for our purposes, stated that plaintiff would not execute on a judgment against the settling defendants in an amount in excess of the settlement and that, should judgment be entered against defendant Adler in excess of a certain amount, the settlement amount would be reduced by $100,000. The agreement with Leonard is exemplary and provided, in relevant part:

"1.   For the consideration of the present payment of [amount deleted], [plaintiff] does hereby agree and covenant to forever refrain from executing on any judgment that may be entered against [Leonard] in any amount in excess of [the settlement amount] on account or in any way growing out of the events described in the above-described Complaint.

"2.   In the event that a trial judgment or settlement against [defendant] exceeds [the settlement amount], [plaintiff] does hereby agree and covenant to discount the settlement by $100,000 and by doing so forever refrain from executing on any judgment that may be entered against [Leonard] in an amount in excess of [the settlement amount] on account or in any way growing out of the events described in the above-described Complaint."

On the first day of trial, the court heard argument on defendant's motion to dismiss the settling defendants as parties to the lawsuit based on their settlements with plaintiff.

The court granted the motion, determining that the settlements left no justiciable controversy between plaintiff and the settling defendants.

Following that ruling, which is not challenged on appeal, and at plaintiff's request, the trial court gave an instruction prior to *voir dire* explaining to the jury pool why others who participated in plaintiff's care were not parties:

> "The claims [against the settling defendants] have now been settled. As such, those people will not be in the courtroom participating in the trial, although you may hear from them as witnesses and will nevertheless be asked to determine if [the settling defendants] were negligent and, if so, whether they were a cause of injury to [plaintiff]."

Plaintiff then moved to prevent any cross-examination of the settling defendants for bias, asserting that, because there was no risk that a judgment would be entered against them, the "discount" provision in the Mary Carter agreements, requiring a reduction in the settlement amount by $100,000 if plaintiff obtained a judgment against defendant over a certain amount, was no longer enforceable—thus, the rule that otherwise allows evidence of settlement agreements in order to show bias was not applicable. *See* OEC 408(2)(b) (settlement evidence admissible to show bias or prejudice); *Bocci v. Key Pharmaceuticals, Inc.,* 158 Or App 521, 536, 974 P2d 758 (1999) (Riggs, J., concurring), *vacated on other grounds,* 332 Or 39, 22 P3d 758 (2001).

The trial court rejected the motion, reasoning that cross-examination of the settling defendants and one expert witness in regard to bias was proper whether or not the three settling defendants had been dismissed from the case and whether or not the terms of the agreement remained in effect after they were dismissed. The court allowed defense counsel to lay a foundation for cross-examination by asking the settling defendants and one expert witness whether they knew of the settlement agreement and, if so, whether they knew of the provision requiring a discount of the settlement amount if plaintiff obtained a judgment against defendant over a certain amount.

On appeal, plaintiff asserts that the trial court erred in allowing questioning of the settling defendants and one

expert witness regarding the Mary Carter agreements. We agree with the trial court that evidence of the discount provision of the Mary Carter agreements was relevant to show possible bias on the part of the settling defendants, even though they were no longer parties, because of their possible continued financial interest in a judgment over a certain amount for plaintiff against defendant. OEC 401 establishes a very low threshold for the admission of evidence, and evidence is relevant "so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Sparks*, 336 Or 298, 307, 83 P3d 304 (2004). Contrary to plaintiff's contention, the unambiguous terms of the agreement show that the discount provision was not dependent on the settling defendants remaining as parties in the case. If plaintiff's judgment against defendant was in excess of a certain amount, plaintiff agreed

> "to discount the settlement by $100,000 and by doing so forever refrain from executing on any judgment that may be entered against a settling defendant in an amount in excess of [the settlement amount] on account or in any way growing out of the events described in the above-described Complaint."

And, contrary to plaintiff's contention, the discount was not contingent on the entry of judgment against a settling defendant. The trial court properly allowed cross-examination of the settling defendants on their knowledge of the Mary Carter agreements and the discount provisions.

We also conclude that the trial court did not err in allowing cross-examination concerning the Mary Carter agreements of an expert witness, Dr. Franks. Although Franks was called as a witness by plaintiff, he had originally been retained by Legacy to testify on its behalf. In light of his relationship with Legacy, the trial court correctly concluded that cross-examination of Franks concerning his knowledge of the Mary Carter agreements was relevant to show bias or intent for impeachment purposes.

At defendant's request and over plaintiff's objections, the trial court took "judicial notice" of the discount provisions of the Mary Carter agreement—which had been

admitted into evidence—and instructed the jury as to the terms of the discount provision with respect to Leonard. Leonard's Mary Carter agreement had been offered into evidence by plaintiff, but could not be viewed by the jury because of references to insurance and settlement amounts. Thus, the trial court instructed the jury as to only the general terms of the discount provision:

> "As I told you at the beginning of the trial, Legacy and Dr. Leonard have settled with [plaintiff]. You have not heard and will not hear how much [plaintiff] received in those settlements. * * * Dr. Leonard signed a settlement document that if [plaintiff] obtained a verdict against [defendant] in excess of a certain sum, then [plaintiff] would discount the settlement with him, that is Dr. Leonard, by a specific amount."

Plaintiff objected to the instruction, contending that the terms of the discount provision were irrelevant and rendered moot by Leonard having been dismissed from the case. In light of our conclusion that the discount provision on its face appears not to depend on Leonard being a party, we conclude that the trial court's instruction was not erroneous for the reason argued by plaintiff. By the same analysis, we reject plaintiff's contention that the trial court erred in rejecting plaintiff's request to include a statement in the instruction that the discount provision had been negated by the trial court's dismissal of Leonard as a defendant.

Reversed and remanded for new trial with instructions to provide peremptory instruction to jury on the existence of a physician-patient relationship.