Argued and submitted February 9, 2011, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court reversed, and case remanded to circuit court for further proceedings July 26, 2012

Cynthia Lynn MEAD,
*Respondent on Review*,

*v.*

LEGACY HEALTH SYSTEM,
an Oregon corporation;
Legacy Good Samaritan Hospital and Medical Center,
an Oregon corporation;
and Hubert Leonard, M.D.,
*Defendants*,

*and*

David ADLER, M.D.,
*Petitioner on Review.*

(CC 0402-01947; CA A130969; SC S058268)

283 P3d 904

Michael T. Stone and Larry A. Brisbee, Brisbee & Stockton LLC, Hillsboro, argued the cause for petitioner on review. Michael T. Stone filed the briefs.

Maureen Leonard, Portland, argued the cause and filed the briefs for respondent on review.

Andrew M. Schlesinger, Lake Oswego, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

KISTLER, J.

De Muniz, J., concurred and filed an opinion.

Walters, J., dissented and filed an opinion.

## KISTLER, J.

An emergency room doctor telephoned defendant (an on-call neurosurgeon) to ask his advice about plaintiff, who had come into the emergency room for treatment. When plaintiff later sued defendant for malpractice, the jury returned a verdict in defendant's favor; the jury found that defendant was not acting as plaintiff's doctor and, as a result, owed her no duty. The Court of Appeals reversed, holding that the trial court should have directed a verdict in plaintiff's favor on that issue. *Mead v. Legacy Health System*, 231 Or App 451, 464, 220 P3d 118 (2009). We allowed defendant's petition for review to consider that issue. Because we conclude that, on this record, the jury could find that defendant was not acting as plaintiff's doctor, we uphold the trial court's ruling denying plaintiff's motion for a directed verdict. We also conclude, however, that the trial court erred in instructing the jury and, for that reason, agree that the case must be remanded for a new trial.[1]

The relevant facts can be summarized briefly.[2] On July 1, 2002, defendant was the on-call neurosurgeon for Legacy Good Samaritan and Legacy Emanuel Hospitals. That day, defendant received a telephone call from a male resident, asking for advice about a patient who had come into the emergency room. The resident told defendant that

"they had a patient who [had come into the emergency room who] had bad back pain, who was neurologically intact, who had [an] MRI with a disk bulge and who had normal rectal tone."

---

[1] The Court of Appeals decision "[r]eversed [the trial court's judgment] and remanded for [a] new trial with instructions to provide [a] peremptory instruction to [the] jury on the existence of a physician-patient relationship." *Mead*, 231 Or App at 468. Although we agree with the Court of Appeals that the judgment must be reversed and the case remanded for a new trial, we disagree with its direction to give a peremptory instruction on remand. For that reason, we affirm the Court of Appeals decision in part and reverse it in part.

[2] Because the jury found that defendant had not entered into a physician-patient relationship with plaintiff, we state the facts consistently with that finding. *See Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 333 Or 304, 310, 39 P3d 846 (2002) (explaining that, when a jury has returned a verdict in favor of a party, we must "uphold the jury's verdict, unless our review of the record reveals that there is no evidence from which the jury could have found the facts" necessary to sustain its verdict).

Defendant understood that the resident was "ask[ing] for [his] advice * * * to determine at this time whether the patient needs to be seen by a neurosurgeon," and defendant's advice was "to admit the patient to the medical service for pain management." Defendant testified at trial that, based on the information that the resident had provided him, he concluded that the patient did not need neurosurgery at that time—a conclusion that was implicit in his advice to admit the patient for pain management. The resident did not ask defendant to see the patient, and defendant testified that he did not "do anything or say anything to communicate to the resident that [he was] somehow going to embark and become involved in the treatment of this patient[.]"

Consistently with his statement that he did not do or say anything to become involved in plaintiff's treatment, defendant did not admit plaintiff to the hospital under his care. Rather, plaintiff's primary care physician, Dr. Kisor, admitted plaintiff to the hospital under her care. (At Legacy, the physician who admits a patient to the hospital is responsible for the patient's care.) Later that day, plaintiff's condition worsened, and Kisor asked a neurologist, Dr. Leonard, for his assistance. Leonard previously had treated plaintiff for migraine headaches, and he consulted with Kisor to determine the cause of plaintiff's worsening condition. Their attempts to determine the cause of plaintiff's condition were not successful, and her condition continued to deteriorate over the next few days.

On July 4, Kisor's nurse called defendant to ask if he would see plaintiff. The nurse did not say that the request was urgent, and defendant asked the nurse to have Kisor call him. Defendant did so for two reasons. As a general matter, when asked to see another doctor's patient, defendant's practice is to speak with the doctor first so that he can ask the doctor questions about the patient's condition. Additionally, and specific to this case, Kisor's nurse told defendant that Kisor was concerned that plaintiff might have a conversion disorder. Because a conversion disorder is a psychological condition that neurosurgeons ordinarily do not treat, defendant did not understand why Kisor would ask for his help with that problem and wanted to speak with her before seeing plaintiff.

Kisor called defendant on July 5. After talking with her, defendant saw plaintiff that day. On examining plaintiff, defendant diagnosed plaintiff as suffering from cauda equina syndrome; specifically, defendant concluded that the MRI taken on July 1 showed that plaintiff had a herniated disk, not a disk bulge as the resident had reported. He also concluded from his review of the MRI and his examination of plaintiff that pulp from the center of the herniated disk had escaped and was pressing on a sheath of nerves (the cauda equina) that govern a person's ability to move their legs and to control their bladder and bowel functions. Defendant operated immediately to remove the pressure. The operation was successful. However, the delay between the onset of the pressure and its removal resulted in substantial damage to the nerves governing plaintiff's ability to control her legs and her bladder and bowel functions.

As a result of that damage, plaintiff filed an action against Legacy for the negligence of its employees and also against Leonard.[3] Later, plaintiff filed a second amended complaint, adding defendant and alleging that he had negligently failed to "timely diagnose, treat and care for plaintiff's low back condition," "timely examine plaintiff," "timely review plaintiff's MRI," and "timely respond to requests for consultation regarding plaintiff's low back condition." Plaintiff's claim against defendant rested on the premise that, as a result of the telephone call defendant received on July 1, defendant had entered into a physician-patient relationship with plaintiff and, as a result, owed her a duty of due care. Plaintiff acknowledged that, if defendant did not enter into a physician-patient relationship with her until Kisor called him on July 5, then she had no claim against him.

Approximately three weeks before the trial began, plaintiff entered into covenants with Legacy and Leonard not to execute on any judgment against them in return for a payment of $4 million. The agreements provided that, if plaintiff recovered more than $3 million from defendant, she

---

[3] Plaintiff's claim against Legacy focused on two of its employees—her primary care doctor, Kisor, and an emergency room doctor, Dr. Zigler. (Zigler was not the male resident who had called defendant.) Defendant was not an employee of Legacy, nor was Leonard.

would return $100,000 each to Legacy and Leonard. Although the covenants contemplated that Legacy and Leonard would remain as defendants in plaintiff's action and participate as such at trial, the trial court ruled that, as result of entering into the covenants, no justiciable controversy remained among plaintiff, Legacy, and Leonard. Accordingly, it dismissed both Legacy and Leonard as defendants.

The case went forward solely against defendant. One of the issues at trial was whether defendant had entered into a physician-patient relationship with plaintiff on July 1. Both sides offered expert testimony on that issue, and each side's expert based his opinion on different testimony regarding what had happened that day. To help put the experts' testimony in perspective, we briefly discuss a factual dispute that informs each expert's opinion.

As noted, defendant testified that, on July 1, he had received a telephone call from a male resident working in the emergency room and that the male resident had told him the information quoted earlier in this opinion. An emergency room doctor, Aviva Zigler, had examined plaintiff when she came to the emergency room. Zigler testified that, after examining plaintiff, she had called defendant on July 1 and had spoken to him personally. According to Zigler, she told defendant more (and sometimes different) information about plaintiff than the male resident had told him. Zigler also testified that, although she had not explicitly asked defendant to see plaintiff, she believed that that request was implicit in her calling him in the first place. Defendant, for his part, testified that he had not spoken with Zigler but had received a call from a male resident.

With that background in mind, we turn to the experts' opinions as to whether defendant entered into a physician-patient relationship with plaintiff on July 1 as a result of a call either from the male resident or Zigler. Dr. Hacker, a neurosurgeon, testified as an expert witness on behalf of defendant. When asked whether, "[i]n your judgment and based upon your training and experience, was there a physician-patient relationship between [defendant] and [plaintiff] over the period [from] July 1 until [defendant] saw her on July 5," Hacker replied, "I didn't

see a doctor-patient interaction or relationship [between defendant and plaintiff] until * * * July 5."[4]

Hacker explained that an on-call physician will have an obligation to see and provide medical services to another doctor's patient in two situations. The first situation occurs when the emergency room physician or another doctor asks the on-call physician for a consultation or, more colloquially, to see the patient. As Hacker explained,

"[A] consultation is very simply obtained. Somebody over the phone will say to me, '[doctor], I want you to see my patient' or '[doctor], I want you to see this patient.' And that's in some regard, when I'm on-call for the emergency room or when I'm in a hospital where I have privileges, it's stipulated by the by-laws that I am then obligated to help out. There is no saying, 'Well, I can't do this' or 'I won't do that.' The minute the doctor says, '[doctor], I want you to see this patient,' the answer is, 'Yes, I'll be happy to.' And that's always the answer because that's the rules."

The second situation occurs, according to Hacker, if "the [on-call] physician had enough information on his [or her] own to conclude this is a patient that I should see." According to Hacker, in both situations, an on-call physician will have an obligation to see and treat another doctor's patient.

Regarding the first situation that Hacker identified, defendant testified that the resident with whom he spoke did not ask him to see plaintiff or provide medical services to her. According to defendant, the resident asked for advice only as to whether the patient needed to be seen by a neurosurgeon. Regarding the second situation, there was evidence from which the jury could have found that the information defendant received from the resident would not have put a reasonable neurosurgeon on notice that "this is a patient [whom he] should see." Specifically, the jury could have found that the information that defendant received from the resident omitted three critical facts that would have alerted a reasonable neurosurgeon that plaintiff could have cauda equina syndrome instead of common back pain.[5]

---

[4] As noted, plaintiff does not dispute that, if a physician-patient relationship did not exist until July 5, she has no claim against defendant.

[5] The jury could have found the following three omissions: First, the resident described the patient's disk problem as a disk bulge rather than a disk herniation.

Plaintiff's expert, Dr. Kendrick, agreed, in part, with defendant's expert. For example, Kendrick testified on direct examination:

> "[W]hen a neurosurgeon is on call for * * * a hospital, and receives a call from an emergency room doctor, a certain obligation is developed. And we as neurosurgeons, when we are on call and get such a call, have to respond, first of all. And if we're asked to see a patient, then we're obligated to undertake the care of that patient and a physician-patient relationship is established per se by the ER physician asking us to see someone."

Consistently with his testimony on direct examination, Kendrick agreed on cross-examination that the "threshold issue, so to speak, [for establishing a physician-patient relationship] is [whether] the emergency room physician request[s] a neurosurgical consultation with [defendant]." Kendrick also testified, as Hacker had, that, if the emergency room physician described sufficient symptoms of a neurosurgical condition, an on-call neurosurgeon would have an obligation to examine the patient and thus undertake the patient's care.

Kendrick agreed that the emergency room physician had not expressly asked defendant to see plaintiff. However, he opined that, in effect, the "emergency room physician was requesting that [defendant] become involved in [plaintiff's] care." He also concluded that the symptoms that the emergency room physician identified were sufficient to require defendant to see and examine plaintiff. It is worth noting that, when Kendrick referred to the "emergency room physician," he appears to have been referring to Zigler, who testified that she had called defendant personally on July 1 to ask for his assistance in treating plaintiff; that is, Kendrick's opinion relies on and tracks Zigler's testimony

---

Only the latter poses a risk of cauda equina syndrome. Second, the resident described the patient's rectal tone as "normal" and did not say that the patient was not able to urinate. An inability to control bowel and urinary functions is a symptom of cauda equina. Third, the resident described the patient as neurologically intact and did not mention weakness or inability to move her lower limbs. Such weakness can signal cauda equina. If the jury credited defendant's testimony, it could have found that the information he received depicted a person with a bad back who should be treated conservatively and that the patient did not require the services of a neurosurgeon at that time.

regarding the call that she supposedly made to defendant on July 1.

Not only did the two experts reach different conclusions regarding whether the facts gave rise to an obligation on defendant's part as the on-call neurosurgeon to see and provide treatment to plaintiff, but each expert appears to have based his opinion on a different set of facts. Hacker appears to have based his opinion primarily on defendant's testimony, and Kendrick appears to have based his opinion primarily on Zigler's testimony. As noted, the jury found that defendant had not entered into a physician-patient relationship with defendant on July 1, and the trial court entered judgment in defendant's favor based on that finding.[6]

The Court of Appeals reversed, holding that the only conclusion that the jury could have reached on this record was that a physician-patient relationship existed on July 1. *See Mead*, 231 Or at 463-64. The Court of Appeals recognized that, without a physician-patient relationship, defendant owed no duty to plaintiff. *Id.* at 457. It also recognized that the formation of that relationship is consensual and that the parties' consent to enter a physician-patient relationship may be either express or implied. *Id.* at 458. In this case, the Court of Appeals found that defendant impliedly consented to enter into a physician-patient relationship from the combination of two facts. *See id.* at 463-64. It concluded that, in advising the resident to admit plaintiff for pain management, defendant was diagnosing plaintiff. *Id.* at 463. It also observed that, in doing so, defendant was acting in his capacity as an on-call physician. It followed from those two facts, the Court of Appeals reasoned, that defendant's "advice * * * was not merely casual or informal advice to a colleague [but instead was] a diagnosis directed to a specific patient." *Id.* at 464. The Court of Appeals held that, because defendant formally had undertaken to diagnose plaintiff, he had entered into a physician-patient relationship with her. *Id.*

---

[6] The jury also found that defendant had not entered into a physician-patient relationship with plaintiff on July 3, 2002. Because plaintiff has not argued on appeal that the trial court should have directed a verdict on that issue, we have not set out the facts regarding that issue.

On review, plaintiff commends the Court of Appeals' reasoning to us. Alternatively, she contends that the trial court erred in instructing the jury on when a physician-patient relationship will arise and also in permitting defendant to impeach her witnesses based on the covenants that either they or their employer entered. We begin with the question that the Court of Appeals decided—whether there was any evidence in the record to support the jury's verdict. Regarding that question, we will "uphold the jury's verdict, unless our review of the record reveals that there is no evidence from which the jury could have found the facts" necessary to sustain its verdict. *See Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 333 Or 304, 310, 39 P3d 846 (2002) (stating that standard).

We begin by setting out the governing legal principles. In Oregon, as in most states, a physician-patient relationship is a necessary predicate to stating a medical malpractice claim. *See Dowell v. Mossberg*, 226 Or 173, 181-83, 355 P2d 624, *rev'd on reh'g on other grounds*, 359 P2d 541 (1961); David W. Louisell & Harold Williams, 1 *Medical Malpractice* § 8.03[1] at 8-17 (2009) (summarizing decisions from other states). As this court recognized in *Dowell*, without a physician-patient relationship, "'there c[an] be no duty to the plaintiff, and hence no liability.'" *Dowell*, 226 Or at 181-82 (quoting *Currey v. Butcher*, 37 Or 380, 385, 61 P 631 (1900)).[7]

A physician-patient relationship may be either express or implied. *See Dowell*, 226 Or at 182. In this case, plaintiff does not contend that defendant expressly agreed to provide medical services to her. Rather, she contends that an implied physician-patient relationship arose when defendant offered an opinion regarding her condition to the emergency room resident on July 1.

---

[7] An action for medical malpractice "antedated any fully developed theory of negligence as a separate basis for action." Allan H. McCoid, *The Care Required of Medical Practitioners*, 12 Vand L Rev 549, 551 (1954). The proposition that a physician's duty extends only to those persons whom he or she agrees to treat derives from cases implying a duty on the physician's part to "use reasonable and ordinary care and diligence" as an incident of an agreement to provide medical treatment. *See, e.g., Leighton v. Sargent*, 27 NH 460, 471 (1853) (implying a duty to use due care and diligence as part of a contract to provide medical services to a patient).

When a patient goes to a doctor's office and the doctor examines the patient, ordinarily no one disputes that an implied agreement to provide medical care has been formed and that consequently an implied physician-patient relationship arises. *Cf. Lyons v. Grether*, 239 SE2d 103, 105 (Va 1977) (holding that an appointment for a specific illness permitted a reasonable inference that the defendant had agreed to provide medical services for that illness and thus provided a basis for inferring a physician-patient relationship). That is, we infer from the parties' actions, considered in light of the customary practice in the medical community, that the physician consented to provide and the patient consented to receive medical services. *Cf. White v. Jubitz Corp.*, 347 Or 212, 234, 219 P3d 566 (2009) (explaining when an implied contract to pay the costs of medical treatment will arise).

Historically, an implied physician-patient "relationship [has been] limited to physicians seen directly by the patient; the physician-patient relationship typically does not exist between the patient and physicians consulted by the patient's personal physician." Louisell & Williams, 1 *Medical Malpractice* § 8.03[2][a] at 8-19 - 8-22 (footnotes omitted). More recently, however, courts have recognized that "[t]he fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." *St. John v. Pope*, 901 SW2d 420, 424 (Tex 1995); *see McKinney v. Schlatter*, 692 NE2d 1045, 1050-51 (Ohio Ct App 1997), *overruled on other grounds by Lownsbury v. VanBuren*, 762 NE2d 354, 362 (Ohio 2002) (holding that it was a question of fact for the jury whether an on-call cardiologist who had discussed a patient's symptoms and test results with an emergency room physician entered into a physician-patient relationship with the person seeking treatment). As one court has observed,

"In light of the increasing complexity of the health care system, in which patients routinely are diagnosed by pathologists or radiologists or other consulting physicians who might not ever see the patient face-to-face, it is simply unrealistic to apply a narrow definition of the physician-patient relationship in determining whether such a relationship exists for purposes of a medical malpractice case."

*Kelley v. Middle Tennessee Emergency Physicians*, 133 SW3d 587, 596 (Tenn 2004); *cf. Eads v. Borman*, 351 Or 729, 743-44, 277 P3d 503 (2012) (noting that changes in the way health care is delivered affect apparent agency analysis); *id.* at 759-60 (De Muniz, C. J., specially concurring) (same).

As the court recognized in *Kelley*, with increasing specialization in the medical profession, hospitals or medical groups may divide responsibility for providing medical services among a team of physicians, with some of the physicians responsible for performing only discrete medical services for the patient. A radiologist, for example, may interpret a patient's x-rays and relay that interpretation to the patient's primary care physician, who uses the radiologist's interpretation to determine the course of the patient's treatment. That division of responsibility for the patient's care may arise as a result of custom or practice, without a formal referral or request for consultation. Faced with that division of services, some courts have sought to determine when a physician who has not personally examined a patient will enter into an implied physician-patient relationship by asking whether the physician has undertaken to provide a particular medical service to a patient. In *Kelley*, the court explained that "a physician-patient relationship may be implied when a physician affirmatively undertakes to diagnose and/or treat a patient, or affirmatively participates in such diagnosis and/or treatment." 133 SW3d at 596.

The standard articulated in *Kelley* depends, as an initial matter, on classifying a physician's actions as either the "diagnosis" or the "treatment" of a patient's condition. Some tasks that physicians perform, such as interpreting an x-ray, may be relatively easy to classify. Others, such as diagnosis, may pose more difficulty. As explained below, not every opinion that one physician offers another constitutes a diagnosis; indeed, the same statement may be a diagnosis when made in one context but not when made in another. That is, the question whether a physician's expression of an opinion constitutes a diagnosis will vary depending on, among other things, the customary practice within the relevant medical community, the degree and the level of formality with which one physician has assumed (or the other physician

has ceded) responsibility for the diagnosis or treatment, the relative expertise of the two physicians, and the reasonable expectations, if any, of the patient under the circumstances.

In our view, the standard should not be whether a judge or a jury would classify a statement as a diagnosis or the provision of treatment. Rather, it should be whether a physician who has not personally seen a patient either knows or reasonably should know that he or she is diagnosing a patient's condition or treating the patient. If the jury finds that, in light of the factors identified above, the physician either knew or reasonably should have known that he or she was diagnosing the patient's condition or providing treatment to the patient, then an implied physician-patient relationship exists and the physician owes the patient a duty of reasonable care.

With that standard in mind, we turn to plaintiff's argument that the trial court erred in denying her motion for a directed verdict. Her argument on that point starts from the proposition that two facts are undisputed: (1) in response to the resident's telephone call on July 1, defendant offered his opinion that plaintiff should be admitted to the hospital for pain management and (2) in offering that opinion, defendant was acting in his capacity as the on-call neurosurgeon. It necessarily follows from the combination of those two facts, plaintiff contends, that defendant was undertaking to diagnose her condition and, in doing so, entered into a physician-patient relationship with her.

Regarding the first fact on which plaintiff relies, the courts consistently have held that merely providing advice to a colleague about that colleague's patient does not give rise to a physician-patient relationship. *See, e.g., Irvin v. Smith*, 31 P3d 934, 941 (Kan 2001); *Reynolds v. Decatur Mem'l Hosp.*, 660 NE2d 235, 238-39 (Ill App Ct 1996); *see also Oliver v. Brock*, 342 So 2d 1, 4 (Ala 1976). That is true even though the patient's doctor has discussed the patient's symptoms and test results with another physician and the physician has offered advice to the patient's doctor about the possible cause of the patient's condition and the proper course of treatment. *See id.*

The Illinois Appellate Court's decision in *Reynolds* is illustrative. In that case, the parents of a two-year-old

brought their child into the hospital emergency room. *Reynolds*, 660 NE2d at 237. The child's temperature was 102 degrees, his body was flaccid from the neck down, and he was having difficulty breathing. *Id.* The parents reported that their child had jumped off a couch and landed on his arm. *Id.* The emergency room doctor called a colleague, Dr. Fulbright, for his advice. *Id.* at 237 She described the child's symptoms to Fulbright, who · testified that they discussed potential causes for those symptoms, ranging from child abuse to meningitis to ascending neuritis, and "[w]e elected to proceed with the plan of [the emergency room doctor's] performing [a] lumbar puncture and [her] letting me know if she needed me there." *Id.*

When the child suffered severe complications, his parents sued Fulbright for malpractice, and the Illinois Appellate Court upheld a decision granting summary judgment in Fulbright's favor. *See id.* at 236. The court held that Fulbright had merely offered an opinion to the emergency room doctor about the possible causes and treatment of the child's condition; that act was not sufficient to give rise to a physician-patient relationship between Fulbright and the child. *Id.* at 239. The court was careful to note the limits of its holding, however. It reasoned:

> "[T]his is not a case in which Fulbright was asked to provide a service for [the child], conduct laboratory tests, or review test results. Fulbright did nothing more than answer an inquiry from a colleague. * * * A doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed. * * * This is not a case in which Fulbright had accepted a referral of the patient. * * * Nor is this a case in which a physician undertook to direct the actions of hospital employees in a telephone conversation with an emergency room nurse."

*Id.* (citations omitted).

We agree with the decisions from other states that advising a colleague about the possible causes of a patient's illness or the proper course of treatment for a patient does not necessarily give rise to an implied physician-patient relationship.[8] Put differently, in light of the customary

---

[8] One state court of appeals has held that a plaintiff need not prove a physician-patient relationship as a prerequisite to stating a medical malpractice

practice in the medical profession, the fact that one doctor offers an opinion to a colleague about that colleague's patient does not necessarily mean that the doctor either knows or should know that he or she is rendering a diagnosis for the patient, as opposed to offering advice to a colleague.

Plaintiff does not appear to dispute that proposition. That is, plaintiff does not contend that, if defendant had made the same statement to the resident—to admit plaintiff to the hospital for pain management—in a different context, the jury would be required to find that defendant was diagnosing plaintiff's condition, as opposed to offering advice to a colleague. She argues, however, that because defendant made that statement in his capacity as the on-call neurosurgeon, the only conclusion that the jury could reach in this case was that defendant was rendering a diagnosis and either knew or should have known that he was doing so.

In considering the effect of defendant's on-call status on the analysis, we note, as an initial matter, that the obligations that flow from a physician's on-call status are not uniform. *Compare Hiser v. Randolph*, 617 P2d 774 (Ariz Ct App 1980), *overruled on other grounds by Thompson v. Sun City Cmty. Hosp.*, 688 P2d 605 (Ariz 1984) (reversing summary judgment in favor of an on-call doctor who declined to treat a patient because the jury could find that the doctor's contract with the hospital obligated him to provide care for every person who came to the emergency room),[9] *with Fought v. Solce*, 821 SW2d 218 (Tex App 1991) (upholding summary judgment in favor of an on-call doctor who declined, when asked, to examine an emergency room

claim. *Diggs v. Ariz. Cardiologists, Ltd.*, 8 P3d 386, 389-90 (Ariz Ct App 2000). Having rejected that requirement, it then held, on similar facts, that a specialist owed a duty of care to an emergency room doctor's patient. *Id.* at 390. In this case, plaintiff has not argued that we should abandon our cases requiring proof of a physician-patient relationship and follow the approach announced in *Diggs.*

[9] The court recognized in *Hiser* that ordinarily "a medical practitioner is free to contract for his services as he sees fit and in the absence of prior contractual obligations, he can refuse to treat a patient, even under emergency situations." 617 P2d at 776. The court held, however, that a jury could find that the defendant had contracted away that right in return for a daily payment to serve as the on-call emergency room doctor at a local hospital. *Id.* at 778. That is, the jury could find that, as a result of that contractual obligation, a physician-patient relationship automatically existed between the doctor and the patient whom the doctor refused to see. *See id.*

patient because the doctor's on-call service was voluntary). Those obligations can vary from one institution to the next depending on the institution's policies, if any; the terms of any agreement to serve as an on-call physician; or, in the absence of institutional policies or an agreement, the customary practice in the relevant medical community.

In this case, neither party identified any hospital policy or agreement between defendant and Legacy that specified defendant's obligations as an on-call physician. Rather, both parties offered expert testimony on the customary practice in the community. Both Hacker and Kendrick testified that, based on that customary practice, defendant had an obligation as the on-call neurosurgeon to provide care to plaintiff if the emergency room doctor asked him for a consultation or, as Hacker put it, if the emergency room doctor asked defendant to "see" plaintiff. Hacker also testified that, if defendant "had enough information on his own to conclude this is a patient that [he] should see," then defendant had an obligation as the on-call neurosurgeon to examine or "see" plaintiff and thus enter into a physician-patient relationship with her—a proposition with which plaintiff's expert agreed.[10]

As explained above, there was evidence that neither condition occurred in this case. Specifically, the jury could have found that the resident who telephoned defendant on July 1 did not ask him to examine or see plaintiff. Rather, he only asked for defendant's advice as to whether plaintiff needed to be seen by a neurosurgeon. The jury also could have found that the symptoms that the resident described to defendant depicted a person with a bad back, not someone suffering from cauda equina syndrome. *See* note 5 above. Finally, the jury could have inferred that those two conditions defined the limits of the obligations that flowed from defendant's status as the on-call neurosurgeon; that is, the jury could have inferred that, unless one of those two conditions existed, defendant's status as the on-call

---

[10] Defendant has not argued that some different obligation flowed from his status as an on-call physician, and we assume, for the purpose of analyzing plaintiff's argument, that Hacker and Kendrick's testimony accurately described the scope of defendant's obligations as an on-call neurosurgeon.

neurosurgeon had no effect on the question whether his advice gave rise to a physician-patient relationship.

Put differently, neither Hacker nor Kendrick testified that the advice defendant gave on July 1 in his capacity as the on-call neurosurgeon was sufficient, without more, to give rise to a physician-patient relationship. And Hacker offered his expert opinion that no physician-patient relationship arose before July 5, testimony from which the jury could have inferred that defendant's advice on July 1 was not sufficient, standing alone, to constitute a diagnosis or at least that defendant reasonably should not have known that it was. There is, in short, evidence from which the jury could have inferred that no physician-patient relationship arose as a result of defendant's advice to the resident.

To be sure, the jury could have drawn a different inference. It could have credited other witnesses and inferred that, in light of defendant's greater expertise in neurosurgery and the allocation of responsibility between emergency room doctors and on-call physicians, the advice that defendant offered the resident effectively ruled out neurosurgical problems as a cause of plaintiff's condition and, as a result, defendant should have known that he was rendering a diagnosis on which the resident and others would rely. The jury, however, was not required to draw that inference. It bears repeating that, when a jury has returned a verdict in favor of a party, we must "uphold the jury's verdict, unless our review of the record reveals that there is *no* evidence from which the jury could have found the facts" necessary to sustain its verdict. *Northwest Natural Gas Co.*, 333 Or at 310 (emphasis added). There is evidence in this record to support the jury's verdict.

We note that the conclusion that we reach in this case is consistent with those courts that have considered similar claims. No court has held that an on-call physician's status coupled with advice about a patient's condition or treatment establishes, as a matter of law, that an implied physician-patient relationship existed. Rather, the courts have held that the combination of those facts either creates a question of fact for the jury or leads to a ruling, as a matter of law, in favor of the on-call physician. *See, e.g., Cogswell v.*

*Chapman*, 672 NYS2d 460, 462 (NY App Div1998) (where an on-call physician "discussed plaintiff's injury with [a physician's assistant treating plaintiff at an emergency room], asked if plaintiff's eye pressure had been checked, and discussed treatment management with [the physician's assistant]," an issue of fact existed as to whether the on-call physician's participation in the patient's treatment gave rise to a physician-patient relationship); *McKinney,* 692 NE2d at 1050 (where an on-call cardiologist discussed test results with an emergency room doctor, offered the opinion that the patient's problems were not cardiac in nature and suggested that the problems could be gastrointestinal, "reasonable minds could come to different conclusions as to whether a physician-patient relationship existed between [the emergency room patient and the on-call cardiologist]"); *Schendel v. Hennepin County Med. Ctr.,* 484 NW2d 803, 808 (Minn CtApp 1992) (where a consulting neurosurgeon countersigned a resident's report stating that x-rays were negative, protocol required the neurosurgeon to examine the x-ray before countersigning, and the neurosurgeon's name and telephone number were shown on the outside of the x-ray jacket, "reasonable inferences permitted the jury to conclude that a physician-patient relationship existed between [the neurosurgeon] and [the patient]").

Indeed, on almost identical facts, the Texas Supreme Court held that no physician-patient relationship existed as a matter of law. *See St. John,* 901 SW2d at 424. The court reasoned:

> "At no time did [the on-call physician] agree to examine or treat [the patient]. Although [the on-call physician] listened to [the treating doctor's] description of [the patient's] symptoms, and came to a conclusion about the basis of [the patient's] condition, he did so for the purpose of evaluating whether he should take the case, not as a diagnosis for a course of treatment."

*Id.* Although we question whether the Texas Supreme Court correctly held that no juror could find that the on-call physician in that case had entered into a physician-patient relationship, we agree that a juror could have inferred on those facts (as on these) that no physician-patient relationship existed. The trial court correctly declined to direct a verdict in plaintiff's favor on the question whether

defendant entered into a physician-patient relationship with plaintiff on July 1. The Court of Appeals erred in ruling otherwise.

Plaintiff argues alternatively that, even if there were evidence from which the jury could have found that defendant did not enter into a physician-patient relationship with her on July 1, the trial court erred in instructing the jury on that issue. In the Court of Appeals, plaintiff assigned error both to the trial court's refusal to give her requested instructions and also to the instruction that the trial court gave. We begin with plaintiff's challenges to the trial court's instruction.

The trial court instructed the jury:

"In order for [defendant] to be liable for negligence in caring for [plaintiff], he must have had a physician-patient relationship with her. In other words, his actions or failure to act cannot be negligence towards [plaintiff] if she was not his patient when he acted or failed to act.

"If a doctor actually examines a patient, there is a physician-patient relationship.

"Also, if another doctor who is treating a patient calls a specialist, who is on-call, the specialist has a physician-patient relationship with the patient, if,

"(1) the doctor who calls the specialist asks the specialist to see the patient and the specialist does not make it clear to the calling doctor that he or she will not do so or,

"(2) the specialist says he or she will see the patient or,

"(3) the specialist takes some affirmative action to diagnose and/or treat the patient showing an intent to participate in the diagnosis, care or treatment of the patient.

"If a physician is 'on-call,' he or she has a duty to be available, to be contacted by emergency room physicians or other health care providers. However, an on-call physician is not automatically in a physician-patient relationship with every patient in the emergency room or the hospital. Also, there is no automatic physician-patient relationship between a specialist and a patient simply because an emergency room doctor or other health care provider calls

the specialist to talk about the patient, even if the specialist gives general advice."

At trial, plaintiff objected to the trial court's proposed instruction on the ground that paragraph (3) includes an erroneous phrase: "showing an intent to participate in the diagnosis, care or treatment of the patient." Plaintiff argued that she did not "think [a physician] should get a get-out-of-jail-free card by saying I didn't intend. If he takes affirmative actions that are implicitly indicating that he is participating in the diagnosis, I think you have got it covered." On review, plaintiff reasserts the objection she raised below. Defendant, for his part, argues that the instruction correctly required the jury to find not only that he undertook to diagnose plaintiff but also that he intended to do so. As we understand defendant's argument, he contends that a finding of intent is necessary to establish that he impliedly consented to entering into a physician-patient relationship.

The trial court's instruction required the jury to infer from defendant's acts "an intent to participate in the diagnosis, care or treatment of the patient." As explained above, however, it is sufficient if defendant either knew or reasonably should have known that he was diagnosing plaintiff's condition or providing treatment to plaintiff. In that event, a physician-patient relationship arose and defendant owed a duty of reasonable care to plaintiff. In requiring the jury to find "an intent to participate in the [patient's] diagnosis, care, or treatment," the trial court required too much. Defendant does not argue that, if the trial court erred in requiring the jury to find intent, the error was harmless. Such an argument would be difficult to make. An instruction that required proof of intent when a lesser mental state will suffice prejudiced plaintiff. *See Wallach v. Allstate Ins. Co.*, 344 Or 314, 180 P3d 19 (2008) (explaining when instructional error will be prejudicial).[11] We accordingly reverse the trial court's judgment and remand for a new trial.[12]

---

[11] Because the issue is likely to arise on remand, we note that the trial court's instruction appears to track the evidence adduced at trial; that is, it attempts to describe the evidence regarding the practice in the medical community instead of identifying a legal standard and permitting the jury to determine whether the facts, considered in light of the practice in the medical community, met that standard.

[12] As noted, plaintiff also argues that the trial court erred in allowing defendant to ask Leonard and Legacy's employees whether they were aware that Legacy and

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**DE MUNIZ, J.,** concurring.

I agree with the reasoning and outcome of the majority opinion. I write separately only to raise two concerns about the jury's task in this case and to offer some observations about the record that may be pertinent to the parties in the event of a new trial on remand.

Although the jury may not have understood as much, part of its duty in this case was to determine what effect defendant's obligations as the relevant on-call specialist (at the time hospital staff sought his advice about plaintiff) had on the formation of a physician-patient relationship between himself and plaintiff. My first concern is with the kind of evidence that the parties presented—seemingly out of necessity—to prove that defendant's obligations as the on-call neurosurgeon either were, or were not, the sort of obligations from which a physician-patient relationship could be inferred in the circumstances. In particular, I find it problematic that the jury was required to base its determination for the most part on the opinions of opposing experts.

The majority opinion points out that the obligations that flow from a physician's on-call status apparently are not uniform, and "can vary from one institution to the next depending on the institution's policies, if any; the terms of any agreement to serve as an on-call physician; or, in the absence of institutional policies or an agreement, the customary practice in the relevant medical community." 352 Or at 282. The opinion thus suggests that there are three kinds of evidence that could be used by a factfinder in determining the import of defendant physician's on-call

Leonard had entered into so-called Mary Carter agreements. More specifically, the parties disagreed whether the "rebate" provisions of those agreements were still in effect after the trial court dismissed Legacy and Leonard as defendants and, if not, whether defendant could still seek to impeach the witnesses with the fact that Leonard or Legacy had entered into the agreements. On that issue, plaintiff's counsel represented that plaintiff, Legacy, and Leonard had modified the agreements after the trial court dismissed Legacy and Leonard as defendants, although plaintiff never submitted the modified agreements to the court. Because this issue may not arise in the same posture on remand, we decline to address it.

status, and that the third kind—expert testimony about the customary practice in the relevant medical community— is inferior and should be offered only when formal policies and contracts pertaining to on-call obligations do not exist. Although the majority opinion does not explain the reasoning underpinning that hierarchy, it should be obvious that the opinions of experts about what doctors do or do not do in particular situations are just that—opinions—and that their persuasive power may have less to do with any objective "truth" than with the style or authority with which they are spoken.

In this case, the parties relied entirely on expert testimony about the customary practice of on-call neurosurgeons in the medical community. Although certain of Legacy Portland Hospitals' bylaws and rules were offered to show that defendant was obligated to *participate* in the hospitals' emergency room "on-call rotation," no rule, policy, or agreement was offered that spelled out defendant's *specific* obligations when he was serving as an on-call medical specialist. Apparently no such rule, policy, or agreement existed. And, as I deduce from my own research, that state of affairs, *i.e.*, the failure of hospitals to spell out specific on-call obligations in rules, policies, and contracts, is more typical than not.

I find it surprising, and a bit dismaying, that hospitals have chosen to leave their relationships with on-call providers to the vicissitudes of what is deemed to be the common practice in the medical community. Given the increasing complexity of the health care industry, the increasing dependence of that industry on institutional resources, the increasing tendency of institutional providers to diagnose patients through specialists who have never seen the patients face-to-face, and the increasing, and perfectly reasonable, tendency of patients to look to institutional providers, rather than the particular doctor that they see, to provide medically appropriate services,[1] it would seem that hospitals would wish to bind any provider on whose

[1] *See* 352 Or at 277 (quoting *Kelley v. Middle Tennessee Emergency Physicians*, 133 SW2d 587, 596 (Tenn 2004)); *Eads v. Borman*, 351 Or 729, 759-60, 277 P3d 503 (2012) (De Muniz, J., specially concurring) (discussing changes in way health care is delivered).

services they depend to a specific set of standards. That hospitals have chosen not to do so with respect to on-call specialists is, of course, not a concern of the courts, but it affects our work insofar as it requires judges and juries to make serious decisions about institutional obligations based on the relative persuasiveness of opposing experts.

My second concern arises out of the trial court's instruction to the jury about when and how a physician-patient relationship might arise between an on-call specialist and an emergency room doctor's patient. The majority opinion finds that instruction to be erroneous on the specific ground that plaintiff identified, but it also hints that the instruction may be problematic in another way. *See* 352 Or at 286 n 11 (noting that instruction "appears to track the evidence adduced at trial" rather than "identifying a legal standard and permitting the jury to determine whether the facts * * * met that standard"). My own view of the problem is that the instruction is likely to confuse the jury about the proper role of certain important evidence that was presented at trial and presumably also will be presented in the trial on remand—expert testimony about common practices and expectations with regard to on-call specialists in the medical community.

According to the majority opinion (with which I agree), the essential "test" for the existence of a physician-patient relationship, when the physician has not dealt with the patient directly, is whether, in light of the particular circumstances, the physician "either knows or reasonably should know that he or she is diagnosing a patient's condition or treating the patient." 352 Or at 279. Among the circumstances that must be considered in making that determination are "the customary practice within the relevant medical community, the degree and the level of formality with which one physician has assumed (or the other doctor has ceded) responsibility for the diagnosis or treatment, the relative expertise of the two physicians, and the reasonable expectations, if any, of the patient under the circumstances." *Id.* With respect to the circumstance in which an on-call specialist is contacted by an emergency room doctor about a patient, the doctor's advice or opinion about the patient's

condition may not amount to a knowing diagnosis or create a physician-patient relationship *as a matter of law*. Rather, because the obligations of on-call specialists may vary from hospital to hospital, the specialist's on-call status can create additional questions of fact relating to the essential test for the existence of a physician-patient relationship. Specifically, the terms of any on-call agreement, the rules and policies of the hospital pertaining to on-call service, and the customary practice with regard to such service in the relevant medical community are additional facts that are relevant to the basic question of whether the on-call doctor knew or should have known that he or she was diagnosing the patient's condition (or treating the patient). *Id.* at 16-17.

In the present case, the parties offered the testimony of several experts relevant to the question of whether, in light of defendant's on-call status and the customary practices of persons engaging in such on-call service in the medical community, defendant knew or should have known that he was diagnosing plaintiff when he told an emergency room doctor that plaintiff did not appear to be a candidate for surgery. However, the instruction that the trial court gave failed to convey that the evidence should be used in that way, and may have led jurors to believe, incorrectly, that the effect of defendant's on-call status on his obligations (or, more to the point, on his imputed understanding of the effect of his advice) was a matter of law, and not a factual matter within the jury's province. A proper instruction would avoid that pitfall by, first, setting out the essential test for a physician-patient relationship as described in the majority opinion, 352 Or at 279 and this concurrence, 352 Or at 289 (De Muniz, J., concurring) and second, describing the various circumstances that should be considered in applying that test, *including* the fact of the physician's on-call status and any of the specific obligations that that on-call status entails, as evidenced by the hospital's rules, regulations, or contracts and the customary practices with regard to on-call service in the relevant medical community.

Because I agree with the reasoning and outcome of the majority opinion, and including my observations set out above, I concur in the decision of the court.

**WALTERS, J.,** dissenting.

It is undisputed that defendant agreed, as a condition of obtaining hospital privileges, to serve as an on-call physician and respond to calls for advice and assistance from emergency room physicians. It is also undisputed that on July 1, 2002, in that capacity, defendant received a call from an emergency room physician seeking, in defendant's own words, his advice "to determine at this time whether the patient needs to be seen by a neurosurgeon."[1] Defendant took the call; obtained the results of plaintiff's physical, neurological, and MRI examinations;[2] determined the nature of plaintiff's medical condition; and advised the emergency room physician that plaintiff was not a neurosurgical candidate and should instead be admitted to the hospital for pain management and control.

Those undisputed facts establish that defendant assumed to exercise, and did exercise medical duties on plaintiff's behalf on July 1. The legal conclusion that follows from those facts is inescapable: The court will imply the existence of a physician-patient relationship and defendant is subject to liability to plaintiff if he failed to perform those services with reasonable care. Because the majority holds otherwise, I respectfully dissent.

---

[1] Defendant described the purpose of his discussion with the emergency room physician as follows:

"The discussion was relatively brief. There was no real sense of urgency. It was a sort of a phone call for advice, what do I—what do you think, this patient has disk bulge on MRI, but she also has this bad back pain and what do you think we ought to do."

Defendant testified that his perception was that the phone call was intended to

"ask about a patient, to be a—ask for advice, to give advice, and to determine at this time whether the patient needs to be seen by a neurosurgeon."

[2] Defendant testified that he was informed that plaintiff "had bad back pain, who was neurologically intact, who had [an] MRI with a disk bulge and had normal rectal tone." Defendant testified that "neurologically intact" meant that no neurological deficits had been found during a neurological exam. He explained that a typical neurological exam

"consists of several components. It consists of doing a mental status exam, being awake, alert and oriented to person, place and time, doing a cranial nerve exam, which are certain nerves that go to predominantly the face and neck and viscera of the chest and abdomen, and doing a sensory and motor exam, as well as a rectal exam to evaluate bowel and bladder, bowel specifically."

The majority begins by stating that "without a physician-patient relationship '"there c[an] be no duty to the plaintiff, and hence no liability."'" 352 Or at 276) (citing *Dowell v. Mossberg*, 226 Or 173, 181-82, 355 P2d 624 (1960), *rev'd on reh'g on other grounds*, 226 Or 173, 359 P2d 541 (1961), *quoting Currey v. Butcher*, 37 Or 380, 385, 61 P 631 (1900)). The majority then decides that it is appropriate to *imply* the existence of a physician-patient relationship when a physician knows or reasonably should know that he or she is diagnosing or treating a patient. 352 Or at 277-78. However, in the final analysis, the majority declines to analyze whether those predicate facts were disputed. Instead, the majority relies on the testimony of expert witnesses about whether defendant met the community standard of care when he failed to go to the hospital on July 1 to personally see and treat plaintiff for its conclusion that a jury could decide that there was no implied physician-patient relationship on that date, and, hence, no liability. 352 Or at 282-83.

To demonstrate the fundamental nature of the majority's error, I begin, as the majority does, with *Dowell* and its citation to *Currey*, an earlier legal malpractice case. In *Dowell*, the court quoted a passage from *Currey*, in which the court explained that a professional has a "duty" to exercise "reasonable care and skill" when the professional assumes to exercise the duties of the profession on behalf of another:

"'Where one adopts the legal profession, and assumes to exercise its duties in behalf of another for hire, the law imposes a duty to exercise reasonable care and skill, and if an injury results to his client from want thereof he is liable to respond in damages to the extent of the injury sustained.'"

*Dowell*, 226 Or at 181, *quoting Currey*, 37 Or at 384-85. The court then continued to reason that a "duty" of care "'arises from the relation of the parties *under the contract*, rather than from the contract itself'" and that it is "'necessary to aver the *contract of employment*, showing the relation of attorney and client, as a matter of inducement, because *without such contract* there could be no duty to the plaintiff, and hence no liability.'" *Dowell*, 226 Or at 181-82, *quoting*

*Currey*, 37 Or at 385 (emphasis added). Finally, the court stated

"'When there is a contract, either express or implied, from which a common-law duty results, an action on the case lies for a breach of that duty, in which case the contract is laid as mere inducement, and the tort arising from the breach of duty as the gravamen of the action.'"

*Dowell*, 226 Or at 182, *quoting Currey*, 37 Or at 385.

What the court explained in *Dowell*, in the terms that the court in *Currey* used in 1900, is that a professional cannot be held liable for damages incurred by another merely because the professional possesses skills and expertise that, if exercised, may have prevented those damages. However, when a professional assumes to exercise and exercises professional duties on behalf of a particular person, the professional does so pursuant to a contract, either express or implied. That contract has legal consequences: It creates a physician-patient relationship, requires the exercise of reasonable care, and subjects the physician to liability for failure to exercise that degree of care.

Oregon statutory law also requires that a licensed physician perform medical duties with reasonable care. Specifically, ORS 677.095(1) requires that licensed physicians "use that degree of care, skill and diligence that is used by ordinarily careful physicians * * * in the same or similar circumstances in the community of the physician." ORS 677.085 sets forth the acts that constitute the practice of medicine and that require licensure,[3] including, as pertinent

---

[3] ORS 677.085 provides:

"A person is practicing medicine if the person does one or more of the following:

"(1) Advertise, hold out to the public or represent in any manner that the person is authorized to practice medicine in this state.

"(2) For compensation directly or indirectly received or to be received, offer or undertake to prescribe, give or administer any drug or medicine for the use of any other person.

"(3) Offer or undertake to perform any surgical operation upon any person.

"(4) Offer or undertake to diagnose, cure or treat in any manner, or by any means, methods, devices or instrumentalities, any disease, illness, pain, wound, fracture, infirmity, deformity, defect or abnormal physical or mental condition of any person.

to the facts in this case, "[o]ffer[ing] or undertake[ing] to diagnose \*\*\* [the] physical or mental condition of any person." "Diagnose," in turn, is defined in ORS 677.010(4) to mean "to examine another person in any manner to determine the source or nature of a disease or other physical or mental condition." Moreover, ORS 677.010(4) specifically provides that that examination need not be made in the presence of the person being examined but may be made based on information provided by the person.[4] Thus, under Oregon statutes, a physician who engages in the practice of medicine, including examining a person and determining the nature of that person's medical condition, must do so with the requisite degree of care.

Under *Dowell* and Oregon statutory law, application of the standard of due care depends on the physician's exercise of medical duties on behalf of a patient and not on the existence of an actual relationship or a personal meeting between the two. So, for instance, a radiologist may examine a patient's medical condition by reviewing x-rays outside of the presence of that patient and without ever meeting or forming a relationship with him or her. Under *Dowell*, because the radiologist has exercised the duties of the medical profession on behalf of that person, the law recognizes the existence of an implied contract to do so. That implied contract creates an implied physician-patient relationship and subjects the radiologist to liability if he or she fails to exercise due care in the performance of his or her medical duties. Under Oregon statutory law, because the radiologist is engaged in the practice of medicine, the law requires the exercise of "that degree of care, skill and

---

"(5) Except as provided in ORS 677.060, append the letters 'M.D.' or 'D.O.' to the name of the person, or use the words 'Doctor,' 'Physician,' 'Surgeon,' or any abbreviation or combination thereof, or any letters or words of similar import in connection with the name of the person, or any trade name in which the person is interested, in the conduct of any occupation or profession pertaining to the diagnosis or treatment of human diseases or conditions mentioned in this section."

[4] ORS 677.001(4) defines "diagnose" to mean:

"to examine another person in any manner to determine the source or nature of a disease or other physical or mental condition, or to hold oneself out or represent that a person is examining another person. It is not necessary that the examination be made in the presence of such other person; it may be made on information supplied either directly or indirectly by such other person."

diligence that is used by ordinarily careful physicians * * * in the same or similar circumstances in the community of the physician[,]" ORS 677.095(1), and subjects the radiologist to liability for negligence if he or she falls below that level of care.

Thus, when a court says that liability depends on the existence of a physician-patient relationship, what it means is that liability depends on the existence of the predicate facts that give rise to an implied, not an actual, physician-patient relationship. When a physician exercises medical duties on behalf of a particular person, those predicate facts give rise to an implied physician-patient relationship, require the exercise of reasonable care, and subject the physician to liability for negligence. The existence of an implied physician-patient relationship is a legal consequence of the predicate facts; it is not itself a factual inquiry. Therefore, the term "physician-patient relationship" does not have significance apart from those predicate facts or the legal consequences that flow from those facts. It is only a label that courts use to make short-hand reference to those predicate facts and their legal consequences.[5]

At points in its opinion, the majority seems to understand and agree with that proposition. The majority frames the standard that determines the existence of the implied physician-patient relationship in terms of the necessary predicate facts: "whether a physician who has not personally seen a patient either knows or reasonably should know that he or she is diagnosing a patient's condition or treating the patient." 352 Or at 279. The majority does not identify the source of that standard in Oregon law, but it is, in my view, consistent with Oregon law. A physician who knows or reasonably should know that he or she is diagnosing a patient's condition also is exercising the duties of the medical profession on behalf of a particular person. Consequently, under *Dowell* and Oregon statute, the

---

[5] The term "physician-patient relationship" is confusing because it can refer to an actual, personal bond or a relationship that is created by law. Some members of a patient's medical team may form actual, personal bonds with their patients while others will not. It is confusing to explain the duty of care as arising from the existence of a physician-patient relationship when the relationship may exist only as a matter of law and not as a matter of fact. The term is unnecessary, and I advocate that it be avoided.

physician must perform those duties with reasonable care and is subject to liability for negligence in that performance.[6]

Applying the standard that the majority articulates, the question should be whether the uncontested facts established that, on July 1, defendant knew or reasonably should have known that he was diagnosing, or determining the nature of, plaintiff's medical condition. However, the majority instead looks to the testimony of expert witnesses who were not asked to consider, and who did not address, that question.

The majority cites the testimony of doctors Hacker and Kendrick, both of whom testified about whether, to meet the community standard of care, defendant was required to come in to the hospital on July 1 to see and care for plaintiff. Both of those physicians testified that, when an emergency room physician requests that a neurosurgeon "see" a patient, or when the neurosurgeon obtains sufficient information to alert the neurosurgeon of the need to do so, the neurosurgeon must come to the hospital and personally see and examine the patient. In this case, Hacker, who testified for defendant, opined that, although defendant did not go to the hospital to see plaintiff on July 1, he met the community standard of care because the emergency room physician did not request that defendant "see" plaintiff, and the information that the emergency room physician relayed was not sufficient to alert him that he should do so. Kendrick, who testified for plaintiff, concluded that the emergency room physician had requested defendant's participation in plaintiff's care. Neither witness questioned the assumption that defendant was required to exercise reasonable care in the duties that he actually performed on July 1—answering the call from the emergency room physician and giving his expert advice. Instead, the experts testified at length about the significance of the information that defendant obtained about plaintiff's

---

[6] Both the majority standard and Oregon law capture the concept that the genesis of a physician's tort duty is in contract and depends on his or her consent—either express or implied—to perform medical duties for a patient. The majority standard does so by requiring that the physician's diagnosis or treatment occur under circumstances indicating that the physician knew or should have known that he or she was performing medical duties on behalf of a patient. Oregon law does so by requiring that the circumstances indicate that the physician assumed to exercise and did exercise medical duties on behalf of a patient.

medical condition on July 1 and whether the conclusion that he reached—that plaintiff was not a neurosurgical candidate—was reasonable in light of that information and the applicable standard of care. That testimony created an issue of fact as to whether defendant *met* the standard of care on July 1. However, it did not create a question of fact as to whether defendant was *required to exercise* reasonable care on that date.

Neither Hacker nor Kendrick disputed that defendant was performing medical duties when he responded to the call from the emergency room physician on July 1. As Kendrick testified, "we as neurosurgeons, when we are on call and get such a call have to respond, first of all." The witnesses also did not dispute that defendant obtained the results of plaintiff's physical, neurological, and MRI examinations and provided the emergency room physician with his expert opinion that plaintiff's condition was such that she was not a candidate for neurosurgery. Because those facts demonstrate that defendant knew or should have known, on July 1, that he was examining and determining the nature of, or "diagnosing," plaintiff's medical condition and that defendant was performing medical duties on behalf of plaintiff, legal consequences flow from those facts: The law implies the existence of a physician-patient relationship and imposes a duty of reasonable care.

Furthermore, whether defendant met the community standard of care by the actions that he did not take—failing to "see" and treat plaintiff on July 1—does not address whether defendant met the standard of care by the actions that he did take—in examining and determining the nature of plaintiff's medical condition on that date. Harkening back to my previous example, customary practice may not require a radiologist to "see" or treat a patient, but that does not mean that the law will not imply a physician-patient relationship from the duties that the radiologist did perform—examination of the patient's x-rays—and require that those duties be performed with reasonable care. Here, even if customary practice did not require defendant to come to the hospital to personally see and treat plaintiff on July 1, the law implies a physician-patient relationship from

defendant's assumption and performance of other medical duties—responding to the call from the emergency room physician and examining and determining the nature of plaintiff's medical condition—and requires that defendant perform those duties with reasonable care. The testimony of doctors Hacker and Kendrick appropriately addressed the factual question of whether defendant acted in accordance with the standard of care on July 1. But that testimony cannot relieve defendant of the legally imposed obligation to do so.

The majority's reliance on Hacker's conclusory testimony is misplaced for the same reasons. When asked whether, "[i]n your judgment and based upon your training and experience, was there a physician-patient relationship between [defendant] and [plaintiff] over the period [from] July 1 until [defendant] *saw* her on July 5," Hacker replied, "I didn't see a doctor-patient *interaction* or relationship [between defendant and plaintiff] until the first note I read by [defendant] on July 5." (Emphasis added.) The question was neither posed nor answered in terms of whether the predicate facts that give rise to an implied physician-patient relationship were established. Those facts—that defendant exercised medical duties on behalf of plaintiff on July 1— were proved. Hacker's testimony that no personal interaction occurred on that date does not negate those facts and cannot negate their legal consequences: An implied physician-patient relationship existed, defendant was required to act with reasonable care, and he was subject to liability if he did not. Unlike the majority, defendant does not argue that Hacker's testimony creates a question of fact about whether an implied physician-patient relationship existed on July 1, and for good reason. That conclusion follows as a matter of law from the predicate facts; it is not itself a factual inquiry amenable to expert testimony.

This is not a case like those that the majority cites from other jurisdictions, in which the physician whose conduct is at issue did not serve in a formal on-call capacity,[7]

---

[7] I agree that physicians who give advice of an informal or general nature may not be subject to liability. *See, e.g., Jennings v. Badgett*, 230 P3d 861, 868-69 (Okla 2010); *Stutes v. Samuelson*, 180 SW3d 750, 754-55 (Tex App 2005); *Corbet v. McKinney*, 980 SW2d 166, 171 (Mo App 1998); *Reynolds v. Decatur Memorial Hosp.*, 277 Ill App 3d 80, 85, 660 NE2d 235 (1996); *Lopez v. Aziz*, 852 SW2d 303,

or declined to provide advice or medical services for the benefit of the emergency room patient.[8] Here, defendant was not acting informally, but pursuant to contract. Defendant agreed, as a condition of obtaining hospital privileges, to serve as an on-call physician and was required to respond to the emergency room physician's request for assistance. Defendant did not decline to give the emergency room physician his expert opinion as to how plaintiff should be treated. He obtained the results of plaintiff's physical, neurological, and MRI examinations before he reached his conclusion about the nature of her condition—that she was not a candidate for neurosurgery. Defendant performed those duties as a member of plaintiff's medical team, and there is no reason that he, like other members of that team, should not be held to a standard of reasonable care.[9]

I do not understand the majority's hesitation to simply decide that defendant was required to exercise reasonable care in the performance of his medical duties on July 1. Other professionals, such as radiologists, nurses, and hospital administrators who perform medical duties on behalf of patients are required to perform their duties with reasonable care and are subject to liability if the harm that the patients suffer is reasonably foreseeable and the

---

306-07 (Tex App 1993); *Hill v. Kokosky*, 186 Mich App 300, 303-04, 463 NW2d 265 (1990).

[8] I agree that on-call physicians who do not actually provide advice or medical services of any kind may not be subject to liability. *See, e.g., Reynosa v. Huff*, 21 SW3d 510, 513 (Tex App 2000); *Prosise v. Foster*, 261 Va 417, 423-24, 544 SE2d 331 (2001); *Anderson v. Houser*, 240 Ga App 613, 618, 523 SE2d 342 (1999); *Oja v. Kin*, 229 Mich App 184, 190-91, 581 NW2d 739 (1998); *Fought v. Solce*, 821 SW2d 218, 220-21 (Tex App 1991).

[9] This also is not a case that arose on a defendant's motion for summary judgment. The cases from foreign jurisdictions that the majority cites, 352 Or at 283-84, do not stand for the proposition that the existence of an implied physician-patient relationship is always a question of fact for a jury. In those cases, courts denied *defendant physicians'* motions for summary judgment, directed verdict, or judgment notwithstanding the verdict, on the ground that those *defendants* were not entitled to judgment as a matter of law. *See Cogswell v. Chapman*, 249 AD2d 865, 672 NYS2d 460 (1998) (affirming denial of defendant physician's motion for summary judgment); *McKinney v. Schlatter*, 118 Ohio App 3d 328, 692 NE2d 1045 (1997) (reversing grant of directed verdict for defendant); *Schendel v. Hennepin County Medical Center*, 484 NW2d 803 (Minn App 1992) (physician defendants appealed denial of judgment notwithstanding the verdict; court determined that evidence supported physician-patient relationship). The plaintiffs in those cases did not contend that the facts that gave rise to a duty of care were uncontested.

professional's negligence is a cause in fact of that harm.[10] I do not understand why the same should not be required of defendant. For him, however, instead of clearly stating the applicable rule, the majority requires a jury to consider, among other things,

> "the customary practice within the relevant medical community, the degree and the level of formality with which one physician has assumed (or the other doctor has ceded) responsibility for the diagnosis or treatment, the relative expertise of the two physicians, and the reasonable expectations, if any, of the patient under the circumstances."

352 Or at 278-79. I cannot find those factors in Oregon law, and I do not know how a jury is to use them in deciding whether a physician knew or should have known that he or she was diagnosing, or determining the nature of, a patient's medical condition. In this case, customary practice may affect the standard of care that defendant was required to meet— for instance, the information that defendant was expected to obtain from the emergency room physician—but I do not understand how customary practice bears on whether defendant knowingly considered and determined the nature of plaintiff's medical condition. Defendant was responsible for the diagnosis that he imparted to the emergency room physician. If the emergency room physician did not rely on that diagnosis, a jury may find that defendant's diagnosis was not a cause in fact of plaintiff's injuries, but I do not understand how the emergency room physician's ultimate responsibility for the patient's treatment bears on whether defendant made his own determination of the nature of plaintiff's medical condition and should be required to do so with reasonable care. Plaintiff may not have known of defendant's role in diagnosing her condition, but I do not understand how that could affect whether defendant knew that he had that role. Finally, defendant was a neurosurgeon, and the emergency room physician was not. I do not understand how a jury is to consider or weigh that or any of the other factors that the majority identifies to decide whether defendant knew, on July 1, that he was diagnosing plaintiff's medical condition.

---

[10] *See Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987) (setting out that paradigm for assessing liability for negligence). As far as I can discern, neither plaintiff nor the majority asserts that defendant was required to perform a more specific duty than a duty of reasonable care.

I do not understand how a court will instruct a jury on those factors or decide from the jury's factual findings on each of them whether to imply the existence of a physician-patient relationship. More to the point, the parties are entitled to have this court tell them whether, on these facts, defendant was obligated to exercise reasonable care and was subject to liability for his negligence, if any.

The question that defendant himself poses for this court's decision is really quite simple: Whether an on-call neurosurgeon who provides telephone advice that is only a suggestion or a recommendation or that an emergency room physician rejects can be subject to liability for negligence.[11] This court should answer that question affirmatively. In the circumstance in which an on-call neurosurgeon answers a telephone call for advice; obtains the results of an emergency room patient's physical, neurological, and MRI examinations; evaluates and determines the nature of the patient's medical condition; and gives the emergency room physician his or her opinion in that regard, this court should hold that the neurosurgeon is performing medical duties on behalf of the patient and must exercise reasonable care. The neurosurgeon's advice may be quite reasonable, or the emergency room physician may not be required to accept or even may reject it. If so, a jury may find that the physician is not negligent or that the advice was not the cause in fact of the patient's harm and render its verdict for defendant. But the neurosurgeon, like the radiologist and other members of the patient's medical team, is required to use due care. Because the majority permits a jury to decide otherwise, I dissent.

---

[11] In his brief in this court, defendant identifies the question presented and the proposed rule of law as follows:

"Question Presented: When does a physician-patient relationship arise between an emergency room patient and an on-call neurosurgeon, when that neurosurgeon is consulted over the telephone by the ER physician?

"Proposed Rule of law: An implied physician-patient relationship arises when a physician affirmatively undertakes to diagnose and/or treat the patient. However, such a relationship will not arise where an on-call physician, *consulted over the telephone regarding an emergency room patient, provides advice that is only a suggestion or recommendation regarding the patient's treatment that can be either accepted or rejected by the ER physician, or if the advice is rejected by the ER physician.*"

(Emphasis added.)