*152 KISTLER, J.
Plaintiffs brought this medical malpractice action to recover for injuries that their son sustained during delivery. On review, the issues are whether ORCP 59 H limits an appellate court’s ability to review objections to a trial court’s instructional rulings and whether a statutory cap on non-economic damages constitutionally can be applied to actions brought by children injured during birth. The Court of Appeals held that, because defendant had not excepted to the trial court’s rulings as ORCP 59 H requires, it could not seek appellate review of those rulings. Klutschkowski v. PeaceHealth, 245 Or App 524, 543-44, 263 P3d 1130 (2011). The Court of Appeals also explained that, because the common law did not recognize a cause of action in 1857 for injuries a child sustained during birth, Article I, sections 10 and 17, of the Oregon Constitution do not limit the legislature’s authority to cap the damages resulting from those injuries; the Court of Appeals accordingly held that the trial court should have applied a statutory cap to the jury’s award of noneconomic damages. Id. at 548-49. We allowed the parties’ cross-petitions for review and now reverse the Court of Appeals decision to the extent that it reduced the jury’s award of noneconomic damages.
I
We set out the facts consistently with the jury’s verdict. See Mead v. Legacy Health System, 352 Or 267, 269 n 2, 283 P3d 904 (2012); Delaney v. Taco Time Int'l, 297 Or 10, 12, 681 P2d 114 (1984). Mother and father have four children. When mother gave birth to her fourth child Braedon, he sustained an injury to the nerves that control the use of his arm. That injury is more likely to occur when a condition known as a shoulder dystocia has occurred during a previous delivery and when the child’s fetal size exceeds a certain weight.
A shoulder dystocia occurs when an infant’s shoulder becomes stuck behind the mother’s pubic bone as the infant travels down the birth canal. When a shoulder dystocia occurs, the delivering physician customarily uses one of two maneuvers (the McRoberts maneuver or the Woods corkscrew *153 maneuver) to free the infant’s shoulder and complete the delivery.[1] Those maneuvers and the traction resulting from the shoulder dystocia can stretch and sometimes injure the infant’s brachial plexus, a network of nerves that run from the area of the spine around the infant’s neck and control the movement of the infant’s arm. Once a shoulder dystocia has occurred during a delivery, the risk of a brachial plexus injury in a subsequent delivery increases; it is 10 times more likely that another shoulder dystocia will occur during a subsequent delivery.
The second factor that increases the risk of a brachial plexus injury is the infant’s fetal size. An infant whose fetal size exceeds 3500 to 4000 grams is more likely to sustain a brachial plexus injury during birth because of the increased traction that a relatively large infant experiences as he or she travels through the birth canal. The expert medical testimony in this case permitted the jury to find that, when those two risk factors are present, the standard of care requires an obstetrician to inform an expectant mother of the risk of a brachial plexus injury if she delivers the child vaginally and to discuss the option of proceeding with a caesarian delivery, commonly known as a C-section.
In 1999, mother gave birth to her third child Anna. When Anna was born, she weighed 4135 grams, and her delivery was complicated by a shoulder dystocia. Dr. Powell, the obstetrician who delivered Anna, worked for defendant Oregon Medical Group (defendant or the Medical Group). Powell diagnosed the shoulder dystocia but did not mention it to mother. In the hospital chart, he documented that “[t]here was a shoulder dystocia [which he] managed by shoulder rotation maneuver with the patient’s hips in a flexed position.”[2] Anna did not suffer any injuries as a result of the shoulder dystocia.
*154 Five years later, in 2004, mother became pregnant with her fourth child Braedon. By that time, Powell no longer worked for the Medical Group, and mother began seeing a new obstetrician employed by the group, Dr. McCarthy. When McCarthy began providing prenatal care to mother, McCarthy reviewed the hospital file from Anna’s delivery in 1999. That file contained Powell’s notation that a shoulder dystocia had occurred, a notation that McCarthy transferred to Braedon’s prenatal records. McCarthy, however, did not tell mother of the increased risk of another shoulder dystocia and a brachial plexus injury, nor did she discuss with mother that, because of that risk, she may want to consider a C-section.
During the third trimester of mother’s pregnancy with Braedon, McCarthy observed that Braedon was “large for [his] gestational age.” To determine Braedon’s actual size, McCarthy ordered an ultrasound, which revealed that Braedon weighed 3964 grams. Because mother was concerned about the size that Braedon would reach by the time she went into labor, she asked, and McCarthy agreed, to induce labor early. However, after receiving the results of the ultrasound, McCarthy did not tell mother that the baby’s fetal size increased the risk of a shoulder dystocia and a brachial plexus injury, even though that risk factor and the earlier shoulder dystocia were both present. By that time, McCarthy had forgotten that a shoulder dystocia had occurred during Anna’s delivery.
Mother went into labor before it was scheduled to be induced. When she arrived at the hospital, McCarthy was unavailable; so, Dr. Monji, the on-call obstetrician, assumed responsibility for delivering Braedon. (Monji was also an employee of the Medical Group.) When Monji spoke with mother before the birth, she asked mother whether there had been any complications in her previous deliveries. Mother replied that there had not been. Additionally, the prenatal record that the Medical Group sent to the hospital did not contain the notation of the earlier shoulder dystocia or the results of the ultrasound and fetal size determination. Monji accordingly did not discuss with mother the risks of proceeding with a vaginal delivery rather than a C-section.
*155 During Braedon’s delivery, a shoulder dystocia occurred. According to Monji’s delivery notes, Braedon was delivered “with a modified McRoberts maneuver.” At one point during Braedon’s delivery, Monji asked father, who was in the delivery room, to help “get [mother’s] legs way back,” “up close to her chest,” a request that was consistent with using a McRoberts maneuver to deliver Braedon. Father testified at trial that, at a later point during the delivery, he saw Monji “plac[e] her hands around Braedon’s [head] — underneath Braedon’s jaw around his neck, and [she] was pulling.” At that point, father “thought that maybe something was wrong.”
Braedon was born with bruises on his right arm, shoulder, and areas of his chest. After the delivery, the range of motion in his right arm was limited, and he was transferred to the neonatal intensive care unit for observation. When he was released from the neonatal unit the next day, Braedon’s color had substantially returned to normal, but the range of motion in his right arm remained limited. Braedon was eventually diagnosed with a brachial plexus injury, an injury that has substantially impaired Braedon’s use of his right arm.
Mother and father (plaintiffs) filed this action for medical malpractice against the Medical Group and various other defendants.[3] Before trial, they amended the complaint to allege claims against only the Medical Group, Dr. Monji, and Dr. McCarthy. The day before trial, they dismissed their claims against Monji and McCarthy, leaving the Medical Group as the only defendant. Plaintiffs alleged that the Medical Group was negligent:
“[(1)] In failing to inform [mother] that the occurrence of shoulder dystocia in the March 3, 1999, delivery and the fetal size determination by Dr. McCarthy and by the April 23,2004, ultrasound increased the risk of shoulder dystocia occurring in a vaginal delivery of Braedon Klutschkowski;
*156 “ [(2)] In failing to inform [mother] that there was increased risk of Braedon Klutschkowski suffering a brachial plexus injury if shoulder dystocia occurred during his delivery;
“ [(3)] In failing to offer [mother] the option of a C-section as an alternative to a vaginal delivery of Braedon Klutschkowski;
“ [(4)] In failing to document in [mother’s] pregnancy record for her pregnancy with Braedon Klutschkowski the occurrence of shoulder dystocia during the March 3, 1999, delivery; [and]
“[(5)] In failing to inform Dr. Monji of the occurrence of the shoulder dystocia in [mother’s] March 3, 1999, delivery, of Dr. McCarthy’s assessment of Braedon’s fetal size as large for gestational age and of the April 23, 2004, ultrasound documentation of an estimated fetal weight of3964 g. and greater than the 97th percentile [.]”
In a separate paragraph of the complaint, plaintiffs alleged that the Medical Group “did not obtain [mother’s] informed consent to delay Braedon Klutschkowski’s delivery past [the date of the ultrasound], and to deliver Braedon Klutschkowski vaginally rather than by cesarean section.” Finally, plaintiffs alleged that, as a result of the Medical Group’s negligence and failure to obtain mother’s informed consent, “Braedon Klutschkowski suffered permanent and severe birth injuries when he was born on or about May 2, 2004.”
We discuss below the specific objections and rulings that have given rise to the petition and cross-petition for review in this case. At this point, it is sufficient to note that the jury returned a general verdict, finding that the Medical Group had been negligent. It awarded plaintiffs $557,881.11 in economic damages and $1,375,000 in noneconomic damages. After the jury returned its verdict, defendant moved to impose a $500,000 statutory cap on the jury’s award of noneconomic damages. Plaintiffs responded that applying the cap would violate Article I, sections 10 and 17, of the Oregon Constitution. The trial court denied defendant’s motion. On appeal, the Court of Appeals reversed the trial court’s ruling that capping the jury’s award of noneconomic damages would violate the Oregon Constitution but otherwise affirmed the trial court’s judgment.
*157 II
On appeal and again on review, the parties debate whether the trial court erred in instructing the jury and whether applying a statutory cap to the jury’s damages award would violate the Oregon Constitution. We begin with defendant’s challenges to giving plaintiffs’ requested instruction on informed consent and to declining to give defendant’s requested instruction regarding its responsibility for its employees.
A
Defendant argues initially that the trial court erred in giving plaintiffs’ requested instruction on informed consent. Because the Court of Appeals ruled that defendant did not preserve its objection to that instruction or properly except to it, we set out defendant’s objections and exception to the instruction. We then consider whether defendant’s objections and exception were sufficient to preserve the issue it sought to raise on appeal. Because we conclude that they were, we consider finally whether the trial court committed reversible error in instructing the jury on informed consent.
At multiple points during the trial, the parties discussed whether and how ORS 677.097, the informed consent statute, applies to a vaginal delivery. Defendant consistently took the position that a vaginal delivery is not a “procedure or treatment” that requires “informed consent” within the meaning of ORS 677.097.[4] In defendant’s view, a vaginal delivery is the natural consequence of a pregnancy and will occur without regard to whether the physician seeks or obtains the mother’s consent. As a result, defendant argued, the informed consent statute never applies to a vaginal delivery. Plaintiffs took precisely the opposite position. They argued that, as a matter of law, the statute always applies to vaginal deliveries. The trial court, for its part, consistently expressed its view that whether and how the informed consent statute applies to vaginal deliveries is a question for the jury.
*158 On Monday morning, two days before the trial court instructed the jury, defendant moved for a directed verdict on plaintiffs’ informed consent claim, reiterating its position that the informed consent statute does not apply to vaginal deliveries. The trial court denied that motion. Immediately after ruling on that motion, the trial court invited objections to its proposed instructions. In a colloquy that covers more than 50 pages of the transcript, both sides raised numerous objections to the proposed instructions. When they reached the instruction on informed consent, the court unilaterally noted the parties’ competing positions and posed a hypothetical to the parties to begin the discussion:
“THE COURT: A woman shows up. She’s pregnant. Her first set of options is have the child, not have the child. She decides on having the child. Everyone, I gather from the testimony I’m hearing, decides it will be vaginal. That’s the, for lack of a better term, the default position. Your position [defendant] is that informed consent is not required because [a vaginal delivery is] the default position.
“[DEFENSE COUNSEL]: Right. Yes. I mean, I don’t know how — let’s assume there’s no — -there’s no discussion at all, and the vaginal birth just occurs. Can the mother then just sue the doctor because, you know, she — she experiences complications and then says, hey, you didn’t tell me a pregnancy was dangerous, you didn’t tell me a vaginal delivery could cause me problems [.] I wouldn’t have done it otherwise. I just — it doesn’t follow. There’s — you can’t obtain informed consent for a vaginal delivery.”
The trial court explained that it had difficulty reconciling defendant’s position that informed consent is never required and plaintiffs’ position that it is always required. It asked defense counsel:
“[I]f you take vaginal delivery as a default position, but [if you do] not automatically assume there’s no informed consent required [as defendant does], nor automatically assume that it must be required [as plaintiffs do], then is the determination of the duty not the jury’s?”
Given that question, defense counsel answered, “It’s the jury’s. It’s the jury’s determination.” The trial court then asked, “So, if that’s correct, then does this [instruction on *159 informed consent] belong in [the jury instructions] or not? Because that’s my position.” Defense counsel answered, “No.”
After considering the parties’ objections, the trial court told the parties that it would take the objections that they had made on the record as exceptions and that they need not renew those exceptions after the court instructed the jury. Specifically, the trial court told the parties:
“All right. I’m going to ask for exceptions after I instruct, and if you want to just be extra careful with your record, you can do that, but I’m going to just — I’m going to tell you now that any disagreement you have on the record or any disagreement you have by virtue of an instruction you offered the court that I haven’t given, I will take that right now as an exception, and I don’t feel the need to add to that.
“The purpose of the change in [ORCP 59] is to articulate [a] reason that might, change my mind. And I spent a couple weeks thinking about these things, and I know that the three of you have spent far more than a couple weeks thinking about these. So I think we’ve had a pretty full discussion, and I’m comfortable with your record.”
The trial ended two days later on Wednesday. That morning, the trial court shared a “new version” of the instructions with the parties. Plaintiffs objected to the new version of the informed consent instruction because the court “ha[d] taken out the direct instruction that Oregon Medical Group had the obligation to obtain her informed consent.” The court acknowledged that it had taken out “the first paragraph [of the instruction on informed consent] that I had had before” and noted plaintiffs’ objection.
Later that day, the court instructed the jury. In its instructions, the court told the jury that plaintiffs had made five specific allegations of negligence and then repeated to the jury, essentially verbatim, the five specifications of negligence quoted above. The court described what plaintiffs had to prove to recover on their negligence claim, instructed the jury on foreseeability, and also instructed on the standard of care. It then turned to informed consent. The instruction on informed consent divides into two parts. The first part, which we do not quote in full, told the jury what “a physician *160 must explain” “ [t] o obtain the informed consent of a patient.” The second part of the instruction told the jury:
“A failure to obtain Mrs. Klutschkowski’s informed consent may be considered by you in determining whether or not defendant was negligent.
“In order to find defendant negligent in failing to provide informed consent, you must determine that Mrs. Klutschkowski would not have consented to a vaginal delivery had all the risks and alternatives you find to be material been disclosed to her.”
After instructing the jury, the trial court told counsel for both parties that it was “tak[ing] as given all the exceptions that you *** have already made” and asked whether counsel “wish[ed] to make any other exceptions?” In response to that question, defense counsel identified one other exception that he did not think he previously had mentioned. The court noted the exception, and the parties gave their closing arguments to the jury.
The jury returned a general verdict finding that defendant was “negligent in one or more ways alleged by plaintiffs” and, as noted, awarded plaintiffs $557,881.11 in economic damages and $1,375,000 in noneconomic damages. Defendant appealed, assigning error to the trial court’s rulings denying its motion for a directed verdict on plaintiffs’ informed consent claim and overruling its objection to instructing the jury on informed consent. On appeal, defendant argued that both rulings were incorrect for the same reason — the informed consent statute has no application to a vaginal delivery.
Relying on Shoup v. Wal-Mart Stores, Inc., 335 Or 164, 173-74, 61 P3d 928 (2003), the Court of Appeals held that defendant had not shown prejudice from any error in denying its directed verdict motion. Klutschkowski, 245 Or App at 538-39. The Court of Appeals started from the proposition that plaintiffs’ informed consent claim was effectively a sixth specification of negligence. Id. Given the jury’s general verdict, the court reasoned that the jury could have found defendant negligent based on one or more of the first five specifications of negligence, which defendant had not challenged, rather than on the informed consent claim. *161 Id. It followed that defendant could not show that any error in submitting plaintiffs’ informed consent claim to the jury had prejudiced it. Id. at 539 (citing Shoup, 335 Or at 176).
The Court of Appeals then turned to defendant’s objection to the instruction on informed consent. It observed that ORCP 59 H(l) provides that “[a] party may not obtain review on appeal of an asserted error by a trial court * * * in giving or refusing to give an instruction to the jury” unless the party challenging the trial court’s instructional ruling has “identified the asserted error to the trial court and made a notation of exception immediately after the court instructed the jury.” The court also observed that ORCP 59 H(2) requires that the exception be “state [d] with particularity.”
The court reasoned that ORCP 59 H barred defendant’s challenge to the instruction on informed consent because defendant had not excepted with particularity to that instruction. 245 Or App at 543-44. The court recognized that a party could comply with ORCP 59 H by incorporating an earlier objection by reference. Id. at 540-41. However, the Court of Appeals explained that, in this case, it could not tell whether the terms of the trial court’s proposed instructions had changed between Monday (the day that defendant had objected to the instruction on informed consent) and Wednesday (the day that the trial court had instructed the jury) in such a way that defendant’s earlier objection no longer applied. Id. at 543.
The Court of Appeals identified an additional reason for not reaching the merits of defendant’s objection. It explained that, in the trial court, defendant’s objection to instructing the jury on informed consent had turned on whether “the particular facts of this case required [defendant] to inform [mother] about [the] risks of and alternatives to delivering Braedon vaginally.” Id. (emphasis in original). Given that view of defendant’s trial position, the Court of Appeals concluded that defendant’s argument on appeal— “that no instruction on informed consent should have been given because, as a matter of law, informed consent was inapposite — was unpreserved for appellate review.” Id. at 543-44 (emphasis in original).
*162 On review, defendant argues that, in promulgating ORCP 59 H, the Council on Court Procedures had neither the authority nor the intent to limit the appellate courts’ ability to review a trial court’s rulings on instructions. We need not resolve that issue; even if ORCP 59 H prescribes what a party must do to perfect an objection to an instructional ruling, defendant complied with that rule. Before explaining why we reach that conclusion, it is perhaps helpful to start with the Court of Appeals’ alternative holding that defendant did not preserve the issue it sought to raise on appeal— that informed consent never applies to a vaginal delivery.
The Court of Appeals stated that, in light of the trial court’s colloquy with defense counsel, “the [trial] court understood that whether informed consent was required in this case was a jury question — -an understanding with which [defendant’s] counsel agreed.” 245 Or App at 534. The Court of Appeals based its understanding of defendant’s trial position on the colloquy quoted above. See id. at 534 n 9 (quoting that colloquy as the basis for the court’s statement). In that colloquy, the trial court asked defense counsel:
“If you take vaginal delivery as a default position, but [do] not automatically assume that therefore there’s no informed consent required, nor automatically assume that [informed consent] must be required, then is the determination of the duty not the jury’s?”
Defense counsel replied, “It’s the jury’s. It’s the jury’s determination.”
The trial court’s question asked defense counsel to “not automatically assume that *** there’s no informed consent required.” The question thus assumed away defendant’s position that informed consent is never required for vaginal deliveries. Defense counsel’s answer was responsive to the question the trial court put to him, but it did not signal that defense counsel was somehow abandoning the position that defendant consistently had taken throughout the trial. Were there any doubt about the matter, immediately after defense counsel stated, “It’s the jury’s determination,” the trial court asked, “So, if that’s correct, then does this [instruction on informed consent] belong in [the jury instructions] or not? Because that’s my position [that *163 it does].” Defense counsel responded, “No.” Defendant preserved the issue that it sought to raise on appeal — that informed consent never applies to vaginal deliveries.
Having concluded that defendant preserved its objection, we turn to the question whether defendant’s exception after the trial court gave its instructions complied with ORCP 59 H. As noted, the trial court told the parties that it understood their positions on informed consent and that it would take the objections that they had raised to its proposed instructions as exceptions. Later, after instructing the jury, the court told the parties that it was “tak[ing] as given all the exceptions that you *** have already made” and asked whether the parties had “any other” exceptions. The effect of the trial court’s statement was to incorporate by reference defendant’s earlier objections as exceptions to the instructions the trial court just gave.
This court has explained that the purpose of ORCP 59 H is to “inform the trial court that the instruction may be erroneous and to give the court an opportunity to make corrections.” Delaney, 297 Or at 18; see also Jett v. Ford Motor Co., 335 Or 493, 502-03, 72 P3d 71 (2003). Exceptions must be stated with enough particularity “to apprise the trial court that it was erroneously explaining [the law] to the jury.” State v. Crosby, 342 Or 419, 427, 154 P3d 97 (2007). The exception in this case satisfied that standard.
Defendant consistently and repeatedly took the position that, as a matter of law, a vaginal delivery is not a “procedure or treatment” that requires consent within the meaning of the informed consent statute. When the trial court stated that it was “tak[ing] as given all the exceptions that you * * * have already made,” that statement was sufficient to incorporate by reference defendant’s objection to instructing the jury on informed consent. In light of the trial court’s earlier statement that it would take the parties’ objections as exceptions, defendant did not need to do anything more to put the court on notice of its continued position that any instruction on informed consent was error. See Delaney, 297 Or at 18 (stating the purpose for taking exceptions).
*164 We appreciate the Court of Appeals’ concern that, when a trial court has repeatedly modified its instructions in response to a party’s shifting objections, an exception “for the reasons previously stated” may not put a trial court on notice of which objection or objections the party still believes are germane. In this case, however, defendant’s position— that informed consent never applies to vaginal deliveries— was consistent throughout the trial. Not only was the trial court well aware of the basis for defendant’s objection to its informed consent instruction, but it also was well aware that the only modification that would have satisfied defendant’s objection would have been to omit any reference to informed consent altogether, which it did not do. In those circumstances, defendant’s exception complied with ORCP 59 H.
Turning to the merits of defendant’s objection, we note that defendant did not object at trial to the informed consent instruction on the ground that it inaccurately stated the law. Rather, defendant objected to the instruction for the same reason that it had moved for a directed verdict. In defendant’s view, informed consent has no application to a vaginal delivery, and any claim based on informed consent should not be submitted to the jury. Similarly, in its brief in the Court of Appeals, defendant equated its motion for a directed verdict and its objection to the instruction on informed consent. In defendant’s view, the trial court’s rulings on its directed verdict motion and its objection suffered from the same infirmity: both put before the jury a theory of liability that should never have been submitted to it.
In this posture, we think that the same answer applies to both rulings. Under Shoup, even if the trial court erred in submitting that theory of liability to the jury, defendant failed to show that doing so prejudiced it. As the Court of Appeals reasoned, the trial court instructed the jury on five specifications of negligence to which defendant raised no objection. It also instructed the jury on what the Court of Appeals characterized as a sixth specification of negligence. Without a special verdict identifying which specification or specifications gave rise to the jury’s finding of negligence, *165 we cannot say that any error in submitting the informed consent specification prejudiced defendant.
Our decision in Wallach v. Allstate Ins. Co., 344 Or 314, 180 P3d 19 (2008), is not to the contrary. In that case, the trial court incorrectly instructed the jury on how to allocate damages among successive tortfeasors; that is, the instruction gave the jury the wrong legal rule to decide an issue that everyone agreed was properly before the jury. See id. at 320-21. As noted, defendant has not argued that the instruction on informed consent incorrectly stated the law. Rather, defendant’s objection to instructing the jury on informed consent was the functional equivalent of its motion for a directed verdict on that claim. Both sought to take the issue away from the jury. On review, defendant does not dispute that the Court of Appeals correctly held that, under Shoup, it failed to prove that any error in denying its directed verdict motion prejudiced it. The same conclusion applies equally to its objection to instructing the jury on informed consent.
B
We turn to defendant’s remaining claim of instructional error. Before trial, plaintiffs dismissed their claims against all defendants except the Medical Group. In explaining the acts for which the Medical Group could be held liable, the trial court instructed the jury:
“In this case, Oregon Medical Group is the defendant. A corporation can act only through its agents or employees. Any action by the agent or employee of the corporation is the act of that corporation. I instruct you that Dr. McCarthy and Dr. Monji were the agents and employees of Oregon Medical Group.”
Before the trial court, defendant argued that the court’s proposed instruction was accurate but incomplete. Defendant observed that there was evidence that Dr. Powell was also an employee of the Medical Group, and it reasoned that the trial court’s instructions permitted the jury to find the Medical Group liable for any negligence on Powell’s part, even though the statute of ultimate repose barred any claim *166 against defendant based on Powell’s actions.[5] To prevent the jury from holding it liable for any negligence on Powell’s part, defendant requested the following instruction:
“There are no allegations of negligence against either Dr. Powell or Sacred Heart Hospital, and plaintiffs are not claiming either Dr. Powell or Sacred Heart Hospital violated the applicable standard of care in any way.”[6]
After an extensive colloquy on Wednesday morning in which defendant repeatedly stated its position that the trial court’s proposed instruction was incomplete, the trial court declined to supplement its instruction with defendant’s requested instruction.
On appeal, defendant assigned error to the trial court’s ruling declining to give its requested instruction; defendant argued that the ruling constituted reversible error because it “created an erroneous impression of the law in the minds of the members of the jury[.]” See Hernandez v. Barbo Machinery Co., 327 Or 99, 106, 957 P2d 147 (1998). Plaintiffs responded that defendant’s requested instruction was not necessary to explain a material issue and that the instructions the trial court gave explained fully the specific allegations of negligence that plaintiffs were required to prove. The Court of Appeals affirmed the trial court’s ruling without discussion. Klutschkowski, 245 Or App at 537.
On review, defendant renews its argument that the trial court erred in failing to give its requested instruction. To the extent that the Court of Appeals declined to review defendant’s assignment of error because defendant had not properly excepted to the trial court’s failure to give its requested instruction, the Court of Appeals erred for the reasons stated above. The colloquy between the trial court and defense counsel after the trial court instructed the jury was sufficient to incorporate by reference defendant’s earlier objection. We accordingly turn to the merits of defendant’s objection.
*167 Read in isolation, the trial court’s instruction that a corporation is liable for the negligence of its employees posed a risk that the jury could find defendant liable for Powell’s negligent acts or omissions. Powell had been an employee of the Medical Group when he delivered Anna in 1999, and nothing in the instructions stating that the Medical Group was liable for its employees’ actions precluded the jury from looking to Powell’s actions in 1999 as a source of defendant’s liability. Affirmatively instructing the jury that Drs. McCarthy and Monji were defendant’s employees did not preclude the jury from finding that Powell was also defendant’s employee.
Plaintiffs argue, however, that the specifications of negligence that the trial court read to the jury as part of its instructions effectively limited the jury to finding defendant negligent based on the actions of McCarthy and Monji. We agree. Those specifications alleged that defendant was negligent in its conduct during mother’s pregnancy with Braedon, not in its conduct during her earlier pregnancies.[7] In Hernandez, we explained that a trial court’s refusal to give a party’s requested instruction is not reversible error “if the substance of the requested instruction, even if correct, was covered fully by other jury instructions given by the trial court.” 327 Or at 106. Read as a whole, the instructions that the trial court gave fully conveyed the substance of the requested instruction; put differently, we cannot say that the trial court’s instructions, read as a whole, “created an erroneous impression of law in the minds of the members of the jury[.]” See id.
Ill
Having addressed the instructional issues raised in defendant’s cross-petition for review, we turn to the constitutional issue raised in plaintiffs’ petition for review. After the jury returned its verdict, defendant moved to cap the *168 noneconomic damages that the jury had awarded. See ORS 31.710(1) (imposing a $500,000 cap on noneconomic damages). Plaintiffs responded that applying the cap would violate their right to a remedy under Article I, section 10, of the Oregon Constitution[8] and their right to a jury trial under Article I, section 17, and Article VII (Amended), section 3.[9] Under our decisions, the initial question that plaintiffs’ constitutional claims raise is whether the common law recognized a right to recover for prenatal injuries when Oregon adopted its constitution in 1857. See Smothers v. Gresham Transfer, Inc., 332 Or 83, 124, 23 P3d 333 (2001) (Article I, section 10); Hughes v. PeaceHealth, 344 Or 142, 156, 178 P3d 225 (2008) (Article I, section 17). If it did, then Article I, sections 10 and 17, limit the legislature’s authority to modify plaintiffs’ cause of action for medical malpractice and to reduce the jury’s damages award. See Smothers, 332 Or at 124 (so holding); Hughes, 344 Or at 156 (same).
Before the trial court, the parties focused on a Court of Appeals decision, Christiansen v. Providence Health System, 210 Or App 290, 202, 150 P3d 50 (2006), aff’d on other grounds, 344 Or 445, 184 P3d 1121 (2008), which had held that, when Oregon adopted its constitution in 1857, the common law did not recognize an infant’s right to recover for prenatal injuries. Defendant took the position that, under Christiansen, all injuries that occur before an infant emerges completely from his or her mother’s body are prenatal. Plaintiffs took the position that the phrase “prenatal injuries” means injuries that occur while the child is in the mother’s womb but does not include injuries that occur while the child is in the birth canal. After considering the parties’ arguments and the evidence presented at trial, the trial *169 court denied defendant’s motion and entered judgment for the full amount of the damages that the jury had awarded.
On appeal, the Court of Appeals interpreted its decision in Christiansen as holding that “a claim for prenatal injuries — including those that occur during birth — did not exist at the time that the Oregon Constitution was adopted.” Klutschkowski, 245 Or App at 546. Because Braedon’s injuries had occurred during birth, the Court of Appeals held that, under Smothers, Hughes, and Christiansen, plaintiffs’ constitutional challenges to capping the jury’s award of non-economic damages necessarily failed. Id. at 546-47.[10] The Court of Appeals accordingly reversed the trial court’s judgment to the extent it included all the noneconomic damages the jury had awarded.
In this case, neither party has asked us to reconsider our decisions under Article I, section 10, or Article I, section 17. That is, both parties accept that the common law, as it existed in 1857, is the initial measure of the rights that Article I, sections 10 and 17, grant.[11] The constitutional question raised by plaintiffs’ petition for review accordingly reduces to whether, in 1857, the common law recognized a claim for the type of injuries that occurred in this case.
To put that question in context, it is helpful to recount both the nature of plaintiffs’ claim for negligence and also the facts that bear on when the injury to Braedon occurred. Essentially, plaintiffs’ third amended complaint alleged that, at various points during mother’s pregnancy, defendant negligently failed to inform her that the baby could experience a shoulder dystocia and a brachial plexus injury during a vaginal delivery and that she could choose a C-section instead. Although the negligent omissions that *170 gave rise to plaintiffs’ claim occurred at one or more points during mother’s pregnancy, the harm that made plaintiffs’ claim actionable could and did manifest itself only during delivery and, in this case, resulted in physical injuries only to Braedon. Cf. Lowe v. Philip Morris USA, 344 Or 403, 410-11, 183 P3d 181 (2008) (a plaintiff must allege and prove an actual loss or harm to make out a claim for negligence). Put differently, even though the negligent omissions were separated in time from the injuries that Braedon sustained, those injuries were the direct and foreseeable consequence of defendant’s earlier failure to warn mother of the risks that, in her case, a vaginal delivery posed to her child.
Moreover, the trial court reasonably could have found that the injury to Braedon occurred, to use Dr. Monji’s words, after Braedon’s head had been delivered.[12] On that issue, one doctor testified, to a reasonable medical probability, that a shoulder dystocia had occurred when Monji delivered Braedon. Other doctors testified that, when a shoulder dystocia occurs (when the baby’s anterior shoulder gets stuck behind the mother’s pubic bone), the baby’s head typically will have emerged from the mother’s body. Father testified that his observations in the delivery room were consistent with Monji’s deposition testimony — namely, that she employed a McRoberts maneuver “only after the delivery of Braedon’s head.” In a related vein, father told mother that, after Braedon’s head had emerged, Monji put her hands around Braedon’s head and “was pulling very forcibly, and seem[ed] like she was stretching Braedon’s neck.”[13] Given that evidence, the trial court reasonably could have found that a shoulder dystocia occurred, with a resulting brachial plexus injury, after the delivery of Braedon’s head.
*171 With those facts in mind, we turn to the state of the common law when Oregon adopted its constitution in 1857. The common law has recognized a cause of action for negligence since at least the time of the American Revolution. Smothers, 332 Or at 129. Similarly, a cause of action for medical malpractice preexisted the adoption of the Oregon Constitution. See, e.g., Mead v. Legacy Health System, 352 Or 267, 276 n 7, 283 P3d 904 (2012) (discussing the sources of medical malpractice actions); see also William Blackstone, 3 Commentaries on the Laws of England 122 (1768).[14] Because plaintiffs seek to recover for the negligence and malpractice of defendant’s employees, it appears, at first blush, that plaintiffs are entitled to the protections of Article I, sections 10 and 17.
Defendant argues, however, that an exception to those general principles existed in 1857. Defendant relies on two cases, one from Massachusetts in 1884 and another from Illinois in 1900, for the proposition that, in 1857, an infant had no cause of action for prenatal injuries. See Dietrich v. Northampton, 138 Mass 14 (1884); Allaire v. St. Luke’s Hosp., 184 Ill 359, 56 NE 638 (1900). We turn to those cases to determine the extent to which they carve out an exception from the general principle that negligence and medical malpractice were recognized causes of action in 1857.
In Dietrich, the mother was four to five months pregnant when she slipped on a defect in a town highway and fell. 138 Mass at 14. The fall brought on a miscarriage, and the infant survived its premature birth only briefly. Id. at 15. When the administrator of the child’s estate brought a claim against the town for negligently maintaining the highway, the court dismissed the claim on the ground that the common law did not recognize a civil cause of action for injuries “received by [a child] while in its mother’s womb.” Id.
*172 In reaching that conclusion, the court focused primarily on distinguishing English authorities that had recognized criminal liability for injurious acts directed at an unborn child and also certain property rights in unborn children. Id. at 15-17. Essentially, the court explained that the reasons for imposing criminal liability for injuring unborn children and for recognizing certain property rights in unborn children did not warrant extending civil liability for a negligent breach of the general standard of care. Id. Beyond that, the court offered three reasons for not recognizing a cause of action for negligence. It noted initially that “no case, so far as we know, has ever decided that, if the infant survived, it could maintain an action for injuries received by it while in its mother’s womb.” Id. at 15.[15] It held out the possibility that any injury to a fetus that resulted from a negligent injury to the mother was too remote to be recoverable. Id. at 16-17. Finally, it reasoned that, “as the unborn child was a part of the mother at the time of the injury, any damage to it which was not too remote to be recovered for at all was recoverable by her.” Id. at 17.
The facts in Allaire were essentially the same as those in Dietrich. The mother in Allaire suffered an injury during the course of her pregnancy as the result of an accident, and the physical injury to the mother had a consequential effect on the health of the child. See Allaire, 184 Ill at 361-62.[16] As the court phrased the issue in Allaire, the question was whether the child, “at the time of the alleged injury, in contemplation of the common law, [had] such distinct and independent existence that he may maintain the action, or was he, in the view of the common law, a part of his mother.” Id. at 365. The court stated that, if the injury occurred while the child was part of the mother, the child could not *173 maintain an action. The court explained that, “if [the child was] a part of his mother [when the injury occurred, then] the injury was to her and not to the [child].” Id.
In considering that issue, the court quoted the passage from Dietrich that explained that, because the unborn child was part of the mother, “any damage to [the child] which was not too remote to be recovered for at all was recoverable by her.” See id. at 366 (quoting Dietrich, 138 Mass at 17). The court also cited a case from the Irish courts, Walker v. Great Northern Railway Co., 28 LR Ir 69 (1890), which had held that a child had no cause of action for a railroad’s negligence because the railroad owed a duty to the mother but not to her unborn child. See Allaire, 184 Ill at 366.[17] Having noted the rationales in both Dietrich and Walker, the court in Allaire took a more categorical approach to the issue. It asked whether the child was “part of the mother” when the injury occurred, and it answered that question by positing “[t]hat a child before birth is, in fact, a part of the mother and is only severed from her at birth.” Id. at 368. Because the child in Allaire had been part of the mother at the time of the injury, the court concluded that the child had no cause of action against the defendant.
The question in both Dietrich and Allaire was whether a child could bring a cause of action for a negligently inflicted injury to its mother during the course of her pregnancy that resulted in a consequential injury to what was, at the time of the injury, a fetus.[18] Neither case presented the issue that this case does; that is, neither case addressed whether a defendant’s negligence that directly causes an *174 independent physical injury to the child during delivery was actionable at common law. Both the timing of the injury and the relationship between the defendant’s negligence and the injury distinguish this case from Dietrich and Allaire. On the first point, we note that the injury that Braedon sustained did not occur while he was in his mother’s womb. Not only had delivery begun when Braedon suffered an injury as a result of defendant’s negligence, but the trial court could have found that Braedon’s head had emerged from his mother’s body when the injury occurred. Simply as a matter of categorization, it is difficult to say that Braedon was “part of the mother” at the time of the injury.
Additionally, the considerations that underlay the categorization that Dietrich invoked and on which Allaire placed greater reliance — that the child was “part of the mother” at the time of the injury — are absent here. This is not a case in which the harm that Braedon sustained as a result of defendant’s negligence was too remote to be actionable, as the court concluded the child’s injury was in Dietrich. Rather, as explained above, the direct and foreseeable consequence of defendant’s earlier failure to advise mother of the risks of a vaginal delivery was that Braedon’s shoulder would become stuck behind his mother’s pubic bone during delivery and that he would suffer a brachial plexus injury as a result. Similarly, this is not a case in which, as in Walker, the defendant owed no duty to Braedon. It would be difficult to say that the obstetrician, who at the time of Braedon’s injury held his head in the palms of her hands, owed no duty of care to him. See Mead, 352 Or at 277 (describing when a physician ordinarily owes a duty of care to a patient). Finally, defendant’s negligence resulted in a physical injury only to Braedon, and not to his mother. Without a physical injury to the mother, it is difficult to bring this case within the reasoning of Allaire, which appeared to view the fact that the “injury was to [the mother] and not to [the child]” as synonymous with its conclusion that the child was “part of the mother” when the injury occurred. See Allaire, 184 Ill at 365.
To the extent that Dietrich and Allaire carve out an exception from the general principle that actions for negligence *175 and medical malpractice were recognized causes of action when Oregon adopted its constitution in 1857, they carve out an exception for negligent acts that cause physical injury to the mother and a consequential injury to the fetus during the course of the mother’s pregnancy. The injury that occurred here does not come within the scope of the exception those cases recognized.
One final point deserves mention. The Oregon Court of Appeals held in Christiansen that, in 1857, the common law did not recognize an action for injuries an infant sustained during delivery. See 210 Or App at 292, 302. Defendant commends Christiansen’s holding to us and quotes a passage from that decision in support of its position in this case. The difficulty with defendant’s reliance on that passage is that the sources Christiansen cited in that passage do not do support the conclusion it reached.
The passage from Christiansen on which defendant relies cites two sources. See 210 Or App at 298. The first is Allaire, which we have already discussed. Id. The second is a 1971 annotation in the American Law Reports. Specifically, Christiansen cited two sections of that annotation for the proposition that an injury that occurs during delivery was not actionable in 1857. See id. (citing Roland F. Chase, Annotation, Liability for Prenatal Injuries, 40 ALR 3d 1222 § l[a] n 5, § 2[a] (1971)). The first section that Christiansen cited merely defines the scope of the annotation, which surveys cases from 1884 to 1971. See 40 ALR 3d 1222 § 1[a] n 5. That section does not purport to describe the injuries that were actionable in the nineteenth century. The second section of the annotation that Christiansen cited discusses briefly the “ [historical development of law of prenatal injuries.” Id. § 2[a]. That section of the annotation describes the holdings in Dietrich and Allaire, but does not say that those decisions apply to injuries that a child sustains independently during delivery. In our view, the passage on which defendant relies provides no persuasive support for the conclusion that Christiansen reached and that defendant urges us to adopt.
We assume, for the purposes of deciding this case, that Dietrich and Allaire carve out an exception to the *176 general principle that negligence and medical malpractice were recognized causes of action in 1857; that is, we assume that those decisions stand for the proposition that, in 1857, a child would not have had a cause of action for physical injuries to the mother during the course of her pregnancy that resulted from a breach of the general standard of due care and that had only a consequential effect on what was, at the time of the injury, a fetus. Those decisions, however, do not stand for the proposition that a defendant’s negligence that directly causes a physical injury only or primarily to the child during delivery was not actionable at common law. Those decisions neither address that issue nor provide a basis for saying that that class of cases was excepted from the general rule that negligence and medical malpractice were recognized causes of action in 1857 for which a jury trial was available.[19]
We acknowledge, as we must, that neither party has cited any nineteenth-century case that addresses the specific question that this case presents, nor have we found any. That is, we are not aware of any nineteenth-century case that discusses one way or the other whether a child could maintain a cause of action for medical malpractice for independent physical injuries that the child sustains during delivery as a direct consequence of the defendant’s acts or omissions. Whatever the reason for that absence of authority, our precedents require us to decide whether a cause of action for the injuries Braedon sustained was recognized in 1857. Faced with that question, we follow the general principle that actions for medical malpractice and negligence were recognized in 1857 unless we are persuaded that an action comes within an exception to that rule. For the reasons explained above, we are not persuaded that the injuries that Braedon sustained come within the exception that defendant has identified.
Having decided that question, we turn to our cases under Article I, section 17, to resolve this case. In Lakin v. *177 Senco Products Inc., 329 Or 62, 78, 987 P2d 463 (1999), the court held that applying a legislative cap to reduce a jury’s determination of noneconomic damages violates Article I, section 17, in “civil cases in which the right to jury trial was customary in 1857.” Although the court has stated, since Lakin, that “Article I, section 17, is not a source of law that creates or retains a substantive claim or a theory of recovery in favor of any party,” see Jensen v. Whitlow, 334 Or 412, 422, 51 P3d 599 (2002), we have adhered to Lakin’s holding that
“Article I, section 17, guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases of like nature. In any such case, the trial of all issues of fact must be by jury. The determination of damages in a personal injury case is a question of fact. * * * The legislature may not interfere with the full effect of a jury’s assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857 [.]”
329 Or at 82.
Because an action for medical malpractice is one for which “the right to jury trial was customary in 1857,” Article I, section 17, prohibits the legislature from limiting the jury’s determination of noneconomic damages. See id.; see also Hughes, 344 Or at 156 (recognizing that Article I, section 17, prohibits the legislature from modifying jury awards in actions that were recognized in 1857). It follows that applying ORS 31.710(1) to the jury’s damages award in this case violates that constitutional guarantee. Having reached that conclusion, we need not address plaintiffs’ arguments under Article I, section 10, or Article VII (Amended), section 3. Specifically, we need not decide whether, under Howell v. Boyle, 353 Or 359, 298 P3d 1 (2013), the $500,000 limit on noneconomic damages provided plaintiffs with a substantial remedy within the meaning of Article I, section 10.
The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is affirmed.

 The McRoberts maneuver is performed by flexing the mother’s legs to facilitate release of the infant’s shoulder. The Woods corkscrew maneuver requires the doctor to rotate the infant 180 degrees while the infant is within the birth canal.

 There was a dispute at trial whether a shoulder dystocia had, in fact, occurred during Anna’s delivery or whether the chart notation was an instance in which Dr. Powell had “overcalled” the condition and used the shoulder rotation and flexed hip maneuvers only as prophylactic measures. On review, we assume that the jury resolved that factual dispute consistently with its finding of negligence.

 The third amended complaint named father and mother as plaintiffs, proceeding personally and as guardians ad litem on behalf of Braedon. That complaint sought both economic and noneconomic damages to compensate for Braedon’s injuries, as well as noneconomic damages to compensate for mother’s injuries, which included emotional distress. Only the claim for Braedon’s economic and noneconomic damages was submitted to the jury.

 ORS 677.097 provides that a physician must describe the “procedure or treatment to be undertaken,” alternatives to the procedure or treatment, and the “risks, if any, to the procedure or treatment.” Additionally, it specifies what a physician must do if a patient asks for more information about the procedure or treatment.

 Powell had been an employee of the Medical Group when he delivered Anna in 1999; plaintiffs have not disputed that OES 12.110(4) barred a negligence claim against defendant because of any actions or omissions on Powell’s part.

 The Medical Group did not explain why its requested instruction included the actions of Sacred Heart Hospital, which was dismissed as a defendant.

 The first, second, third, and fourth specifications of negligence, which the trial court read to the jury, refer to specific actions or omissions regarding either Braedon’s delivery or the failure to inform mother of risk factors regarding Braedon’s delivery. The fifth specification refers to the failure to inform Dr. Monji of certain information. Finally, the informed consent instruction, read in context, refers to the failure to inform mother of the risks of and alternatives to delivering Braedon vaginally.

 Article I, section 10, provides:
“No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation.”

 Article I, section 17, provides: ‘In all civil cases the right of Trial by Jury shall remain inviolate.” Article VII (Amended), section 3, provides, in part:
“In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict.”

 Oregon has recognized a common-law right to recover for prenatal injuries since 1955. See Mallison v. Pomeroy, 205 Or 690, 291 P2d 225 (1955). The state of the common law when Oregon adopted its constitution in 1857 is relevant only because, under Smothers and Hughes, that issue bears on whether Article I, sections 10 and 17, limit the legislature’s authority to alter a cause of action or reduce the amount of a jury award.

 Plaintiffs recognize that the common law, as it existed in 1857, is the initial measure of those rights but argue that we should hold that Article I, section 10, protects common-law causes of action not only as they existed in 1857 but also as those causes of action have evolved over time. Given our disposition of plaintiffs’ claim, we need not consider plaintiffs’ argument and express no opinion on it.

 In deciding defendant’s post-verdict motion to cap the noneconomic damages and plaintiffs’ constitutional objection to that motion, the trial court considered the parties’ arguments as to when the injury to Braedon occurred. We state the facts consistently with the trial court’s post-verdict ruling — namely, in the light most favorable to plaintiffs.

 As defendant notes, plaintiffs dismissed their claim that Monji caused the injury to Braedon’s arm by negligently pulling on his head. We quote father’s statements to mother only as evidence from which the trial court could have found that the risk that defendant negligently failed to warn mother about — a shoulder dystocia and a resulting brachial plexus injury' — occurred after Braedon’s head had emerged from his mother’s body.

 Blackstone notes:
“[I]t hath been solemnly resolved, that mala praxis is a great misdemeanor and offence at common law, whether it be for curiosity and experiment, or by neglect; because it breaks the trust which the party had placed in his physician, and tends to the patient’s destruction. Thus also, in the civil law, neglect or want of skill in physicians and surgeons!.]”
William Blackstone, 3 Commentaries on the Laws of England 122 (1768).

 Because the child in Dietrich had been born alive, the court did not invoke common-law cases for the proposition that a stillborn child does not have a civil cause of action, nor did the court invoke the common-law rule that a tort claim does not survive the decedent’s death; cf. Hughes, 344 Or at 152 (reasoning that, in 1857, the common law did not recognize wrongful death actions).

 The complaint in Allaire alleged that the mother had gone to a hospital 10 days before the expected birth of her child. While riding in an unenclosed elevator, she suffered am accidental injury, and the injury to the mother resulted in a consequential injury to the fetus, which was delivered sometime after the injury to the mother.

 In Walker, the mother was injured as a result of the railroad’s negligence, with consequential injuries to the child she was carrying. In a series of seriatim opinions, the court held that the child, once born, had no cause of action against the railroad. The common rationale was that the railroad owed a duty only to the mother, the person whom it had contracted to carry, and, as a result, owed no duty to the unborn child.

 The decisions from other states that followed Dietrich and Allaire arose out of a similar fact pattern. All the cases address negligently inflicted injuries to the mother during the course of the pregnancy that had a consequential effect on the fetus. See, e.g., Buel v. United Rys. Co., 248 Mo 126, 154 SW 71 (1913); Nugent v. Brooklyn Heights R.R., 154 AD 667, 139 NYS 367 (1913); Lipps v. Milwaukee Elec. Ry., 164 Wis 272, 159 NW 916 (1916); Drobner v. Peters, 194 AD 696, 186 NYS 278 (1921). See generally David A. Gordon, The Unborn Plaintiff, 63 Mich L Rev 579 (1965).

 In holding that the common law would have recognized a cause of action for the injuries that Braedon sustained, we do not imply that, in 1857, the common law also would have recognized a cause of action for an infant who was stillborn or who died as a result of the defendant’s actions. See n 15 above. That issue is not before us, and we express no opinion on it.